## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS, BOSTON

| | | |
|---|---|---|
| **MORCOS H. HANNA & SUZAN H. ANDRAUS, JIMMY NUON, KARINA PRAK, and VANNA PHONG,** on behalf of themselves and all others similarly situated | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **C.A. NO.** |
| | ) | **CLASS ACTION COMPLAINT** |
| *v.* | ) ) | **JURY TRIAL DEMANDED** |
| **BAC HOME LOANS SERVICING, LP, BANK OF AMERICA, N.A., COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., FEDERAL HOME LOAN MORTGAGE CORPORATION, and FEDERAL NATIONAL MORTGAGE ASSOCIATION** | ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) ) ) ) ) ) | |

_____

## I.     INTRODUCTION

1.     Plaintiffs Morcos H. Hanna and Suzan H. Andraus, Jimmy Nuon, Karina Prak, and

Vanna Phong on behalf of themselves and all other similarly-situated individuals ("Plaintiffs")

bring this class action as described in the paragraphs set forth herein.

1

2.      This complaint arises from the acts and/or intentional omissions of the Defendants, acting independently and through their subsidiaries, owners and/or predecessors in interest  as follows;

     a.    Defendants Countrywide Financial Corp., Countrywide Home Loans, Inc., and Bank of America, N.A. (collectively referred to as "Originator Defendants");

     b.    Bank of America, N.A. & BAC Home Loans Servicing, LP (BAC) (collectively referred to as "BOA" where not otherwise described in their individual capacities), (all collectively referred to as "Servicer Defendants");

     c.    Federal National Mortgage Association, a.k.a. FNMA and/or Fannie Mae, in its capacity as Trustee for various, as yet identified FNMA Trusts, Federal Home Loan Mortgage Corporation, a.k.a. FHLMC and/or Freddie Mac, in its capacity as Trustee for various, as yet identified FHLMC Trusts (collectively referred to as "Trustee Defendants")

as a result of:

     a.    the Originator Defendants; since January 1, 2002 and through December 31, 2008, negligently offering to the public extremely high risk mortgage loan products, that were designed to allow unsophisticated and/or unqualified borrowers to obtain mortgage loans, the Originator Defendants reasonably foresaw, would be unsustainable for those borrowers and expose them to substantial risk of loss;

     b.    the Servicer Defendants; fraudulently hindering the mortgage loan modification process, deceptively and unfairly misleading borrowers through offers of mortgage modification assistance to borrowers, negligence in duty of care to borrowers during their administration of modification review business practices, all as part of an overall fraudulent scheme to  maximize mortgage servicing profitability;

     c.    the Trustee Defendants and Servicer Defendants; by attempting foreclosure and/or foreclosing Deeds of Trust when no actual default existed to the Holder of the Notes

associated with those Deeds of Trust, in violation of law, and negligence in duty of care when conducting the foreclosure process.

## II.     JURISDICTION AND VENUE

3.      This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that this complaint is a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are 100 or more members in the proposed class and the Named Plaintiffs are citizens of a State different from the majority of Defendants.

4.      The parties are joined in a single lawsuit due to the significant number of common issues of fact and law raised by the claims of the Plaintiffs as detailed below.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because Plaintiffs are residents of Massachusetts and Defendants transact substantial business in this district.

## III.     PARTIES

6.      Individual and Representative Plaintiff Morcos H. Hanna is a citizen of Massachusetts residing at, and claims to be one of the rightful owners of 22A Montvale Avenue, Stoneham, MA 02180 which is the subject property referenced herein.

7.      Individual and Representative Plaintiff Suzan H. Andraus is a citizen of Massachusetts residing at, and claims to be one of the rightful owners of 22A Montvale Avenue, Stoneham, MA 02180 which is the subject property referenced herein.

8.      Individual and Representative Plaintiff Jimmy Nuon is a citizen of Massachusetts residing at, and claims to be the rightful owner of 15 Bertha Street, Lowell, MA 01854 which is the subject property referenced herein.

9.      Individual and Representative Plaintiff Karina Prak is a citizen of Massachusetts residing at, and claims to be the rightful owner of 44 Harvard Street, Lowell, MA 01851 which is the subject property referenced herein.

10.     Individual and Representative Plaintiff Vanna Phong is a citizen of the State of Massachusetts residing at and claims to be the rightful owner of 95 Varley Street, Fall River, MA 02723, which is one of the subject properties referred to herein.

11.     Defendant Bank of America, N.A. is a national bank and financial services corporation with headquarters at 101 Tryon Street, Charlotte, North Carolina 28255.

12.     Defendant BAC Home Loans Servicing, LP is a residential mortgage servicing company and a wholly owned subsidiary of Bank of America, N.A., located at 4500 Park Granada, Calabasas, California 91302.

13.     Defendant Countrywide Home Loans, Inc. was a mortgage servicing subsidiary of Countrywide Financial Corporation and was located at 4500 Park Granada, Calabasas, California 91302.

14.     Defendant Countrywide Financial Corporation was a financial services holding company that was purchased by Bank of America in 2008 and was located at 4500 Park Granada, Calabasas, California 91302.

15.     Defendant Federal Home Loan Mortgage Corporation (FHLMC) is located at 325 Seventh Street, Washington, DC 20002.  Upon information and belief FHLMC was and/or is trustee, guarantor, and/or investor for an as yet accurately identified securitized mortgage backed Trust which owns Plaintiffs' Note and Mortgage.

16.     Defendant Federal National Mortgage Association is located at 3900 Wisconsin Avenue, NW, Washington, DC 20016.  Upon information and belief FNMA was and/or is trustee, guarantor, and/or investor for an unknown number of securitized mortgage backed Trusts which owned Plaintiff's Notes and Deeds of Trust.

17.     In 2007, Defendant Bank of America commenced negotiations to acquire Countrywide Home Loans, Inc. and Countrywide Financial Corporation (hereinafter referred to as "Countrywide").  By late 2007, Bank of America began merging its operations with Countrywide and adopting some of Countrywide's practices.  From and after its acquisition of Countrywide in July 2008 and continuing to the present, both as a successor in interest to

4

Countrywide and as a principal, Bank of America has engaged in and continued the wrongful conduct complained of herein.

18.     The Defendants had actual and/or constructive knowledge of the acts of other Defendants as described herein, and ratified, approved, joined in, acquiesced in, and/or authorized the acts of the other, and/or retained the benefits of said acts.

## IV.     ORIGINATOR DEFENDANTS

### A.     FACTS

19.     The Originator Defendants were/are among the leading providers of residential real estate mortgages in the United States during all times relevant to this complaint.

20.     As the mortgage lending industry grew, fueled by the rapid appreciation of the real estate market, the Originator Defendants were perfectly poised to take advantage of unsophisticated and/or unqualified borrowers through the execution of a scheme designed solely for the purpose of enriching themselves.

21.     Taking full advantage of the complex mortgage securitization mechanisms in place for over a decade, the Chief Executive Officers and the senior management teams of the Originator Defendants realized that through the various methods of securitization of residential real estate mortgages, they could position their companies in such a way so as to almost completely absolve their companies of any risk regarding the future potential of any defaults regarding the mortgage loans they would make.

22.     By pooling and subsequently selling the mortgages they originated, the CEOs of the Originator Defendants knew their companies would not be exposed to the financial consequences associated with potential default of those mortgages.

23.     Knowing their companies would suffer no financial consequences, the CEOs and senior management teams of the Originator Defendants allowed their companies to institute systematic negligent lending policies, based on significantly reduced underwriting standards, and then negligently offer high risk mortgage loan terms, underwritten using the

aforementioned reduced standards, to unsophisticated and/or unqualified borrowers, regardless of their ability to repay.

24.     These unsophisticated and unqualified borrowers would never have been able to qualify for a mortgage using conventional underwriting standards and mortgage loan terms, due to their extreme high risk of default. The Originator Defendants offered these mortgage products knowing they would cause substantial risk of loss to Plaintiff borrowers and others, thereby breaching the Originator Defendants' duty of care they owed to Plaintiffs and others.

25.     The CEOs' and senior management teams of the Originator Defendants condoned and approved the offering of mortgage products, directly and/or through mortgage brokers and correspondent lending partners, such as interest only or negative amortization payment option mortgage loans, stated income or no income verification sub-prime credit mortgage loans, no down payment mortgage loans, and high risk adjustable rate mortgage loans with extremely low initial start rates, underwritten with extremely low credit score, high loan to value and debt to income ratio allowances, to unsophisticated and/or unqualified borrowers on a nationwide scale.

26.     As the Chief Executive Officers (CEOs) and senior management teams of the Originator Defendants knew from no later than 2004, these loans were unsustainable for the borrowers who had relied on the Originator Defendants for financial counsel and advice, and to a certainty would result in a real estate market crash that would, in turn devastate the nation's overall economy, harm Plaintiffs and others by destroying the equity invested by them and cause many of them to eventually default on their mortgages and lose their homes and property.

27.     With their negligently obtained mortgages, the Originator Defendants "pooled" the foregoing mortgages and sold the pools for inflated value to REMIC/Trusts that would pay for the mortgages by issuing Bonds (mortgage backed securities/MBS) to investors on a global scale (securitizing).  This was part of a massive scheme absolving the Originator Defendants of any ownership interest in the mortgage loans they originated, and any impending financial

consequences, from the massive nationwide mortgage loan defaults that the CEOs and senior management teams of the Originator Defendants knew would be the direct result of their negligent underwriting tactics and mortgage loan originations.

28.      The CEOs and senior management teams of the Originator Defendants knew that these extremely high risk mortgages had been made by negligently reducing credible underwriting standards to the point whereby, regardless of their respective organizations' representations to the contrary, the likelihood of borrower non-performance on these mortgages was extremely high.

29.      The CEOs of the Originator Defendants and their senior management teams knew the scheme would directly cause a liquidity crisis that would devastate Plaintiffs' and others home values and net worth.

30.      At the very least, at the time of entering into the Notes referenced herein with respect to Plaintiffs and others, the CEOs of the Originator Defendants and their senior management teams, and each Defendant in the chain of title of the foregoing mortgages and the successors to each of the foregoing, were bound and obligated to fully and accurately disclose to each borrower, including each Plaintiff herein, that the mortgages being offered to the Plaintiffs were, in fact, extremely high risk mortgage loan products designed to enable the Originator Defendants to simply create pools of mortgages for later sale, regardless of quality, to mortgage backed trusts, thus absolving them from exposure to reasonably foreseeable eventual defaults. The CEOs' and senior management teams of the Originator Defendants knew these mortgage loans were "junk", and quite simply didn't care, as they were able to wash their hands of them through their later sale and securitization. The CEOs' and senior management teams of the Originator Defendants knew and reasonably foresaw that their actions, as described herein, would cause harm to Plaintiffs and others.

31.      This scheme was a significant contributing factor which resulted in a nationwide real estate market meltdown, causing home values to decrease significantly, and the nation's economy to collapse, affecting millions of Americans. The resulting economic collapse

contributed to cutbacks in employment, loss of jobs, increases in cost of living, significant loss of individual retirement funds, and homelessness for millions of Americans.

32.     The CEOs and senior management teams of the Originator Defendants' business premise was to leave the borrowers, including Plaintiffs, and the Trusts they sold their mortgages to, responsible once the CEOs of the Originator Defendants and their senior management executives had received huge salaries, bonuses, and sold their respective companies stock options or shares, while investors were buying the Mortgage Backed Securities in increasingly overpriced and high risk mortgage pools before the inevitable market collapse, setting up a second scheme to earn billions of dollars in residential mortgage servicing fees from exploiting the servicing practices of defaulted mortgages.

33.     The CEOs and senior management teams of the Originator Defendants knew their negligent underwriting tactics and high risk lending instruments, offered to unsophisticated and unqualified borrowers, who relied upon them for financial guidance, would result in the loss of the Plaintiffs' and others home equity, would cause severe impairment to the Plaintiffs' and others credit ratings, and eventually the potential loss of Plaintiffs' and others homes through foreclosure. The actions of the Originator Defendants were also the direct cause of extreme emotional distress inflicted on the Plaintiffs and others, as they were subjected to inability to pay their mortgages, foreclosure, and eviction.

34.     As a result, Plaintiffs' and others have lost equity in their homes, lost rightful property interests, their credit ratings and histories were damaged or destroyed, and Plaintiffs' incurred material costs and expenses.

35.     The CEOs of the Originator Defendants and their senior management teams owed a duty of care when offering their mortgage products to Plaintiffs and others and they were significantly negligent in that duty.

36.     The identities of the CEOs of the Originator Defendants who instituted, condoned and/or otherwise approved and executed the aforementioned negligent conduct are as follows;

             i.      Angelo R. Mozilo                Countrywide

| ii. | David Sambol | Countrywide |
| iii. | Eric P. Sieracki | Countrywide |
| ii. | Kenneth D. Lewis | Bank of America |

**B.    NAMED PLAINTIFFS' FACTS & ALLEGATIONS**

**Jimmy Noun v. Countrywide Financial Corp. & Countrywide Home Loans, Inc.**

37.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

38.     Plaintiff Jimmy Nuon is a citizen of Massachusetts residing at, and claims to be the rightful owner of 15 Bertha Street, Lowell, MA 01854 which is the subject property referenced herein.

39.     On October 31, 2005, Plaintiff was deeded the subject property at 15 Bertha Street, Lowell, MA 01854. Said Deed was recorded in the Middlesex North County Registry of Deeds, in Book 19463, at page 40.

40.     On December 15, 2006, Plaintiff refinanced said property with Defendant Countrywide Financial Corp. and/or Countrywide Home Loans, Inc., d/b/a America's Wholesale Lender (Countrywide), and executed a first Mortgage and Note in exchange for a mortgage loan of $200,000.00 and second Mortgage and Note in exchange for a mortgage loan of $25,000.00. Said mortgages were recorded in the Middlesex North County Registry of Deeds, on December 26, 2006, in Book 20830, at pages 119 & 131, respectively.

41.     At the time Plaintiff applied to Defendant Countrywide for said mortgage loan, he was employed as a fabrication technician, earning $36,000.00 per year. Defendant Countrywide offered to make said mortgage loans by qualifying the Plaintiff using the underwriting criteria of a "Stated Income Verification" mortgage loan product.

42.     By using this negligent underwriting criteria, Defendant Countrywide was able to state on the mortgage loan application that Plaintiff was earning $4,500.00 per month, thus enabling him to qualify for said mortgage loan.

43.     Defendant Countrywide, as final underwriter of Plaintiffs mortgage loan application, knew Plaintiff's job description would not reasonably support an income level as stated on his mortgage loan application and that Plaintiff did not earn enough income to qualify for said loan. By offering, either directly or through correspondent lending partners or mortgage brokers, to underwrite Plaintiff's mortgage loan application, which would not require a true and accurate disclosure of Plaintiff's income, said Defendant could make said mortgage loan reasonably knowing and foreseeing that Plaintiff did not have the ability to repay said mortgage loans, and that future default of said mortgage loans was extremely high.

44.     Typically, good mortgage loan underwriting standards would require that the originating lender determine that a potential borrower's income be realistically stated so as to determine a potential borrower's ability to repay.  As the Plaintiff was earning a gross monthly income of roughly $3,000.00 per month it is reasonably foreseeable that he would be unable to repay $225,000.00 in mortgage loan obligations, based on his job description at the time of application for said mortgage loans. In approving Plaintiff for said mortgage loans Countrywide negligently exposed Plaintiff to substantial risk of loss.

45.     Originator Defendant Countrywide knew Plaintiff lacked the ability to reasonably repay said mortgage loans, and knew Plaintiff's lack of income would impair his ability to repay said mortgage loans. However, Countrywide recklessly and negligently developed, offered, and otherwise made available to the public, directly or through correspondent lender partners of mortgage brokers, a high risk mortgage product specifically tailored to Plaintiff's situation.

46.     Countrywide owed Plaintiff a duty of reasonable care to ensure that high risk, poorly underwritten mortgage loan products would not expose him to substantial risk of loss. Instead, Countrywide negligently and recklessly offered said mortgage loan to Plaintiff, regardless of his ability to repay, knowing and reasonably foreseeing that Plaintiff would be exposed to substantial risk of loss.

47.      At best the Plaintiff is an unsophisticated consumer who could be easily taken advantage of by the issuance of a hi-risk mortgage lending instrument to him. Knowing these facts, Countrywide reduced its underwriting standards and developed a high-risk lending instrument specifically tailored to the Plaintiff's situation (and others so similarly situated) so as to make said loan to enrich themselves by negligently and recklessly offering said mortgage loans to Plaintiff and others.

48.      Plaintiff relied on Countrywide's reasonable duty of care to ensure that he would not be offered mortgage loans that would expose him to a reasonably foreseeable substantial risk of loss.

49.      Plaintiff acted on this reliance by accepting the mortgage products offered to him, and was exposed to substantial risk of loss, thus such reliance was to his detriment.

50.      Plaintiff was harmed by Countrywide's negligent mortgage product offerings. Plaintiff's mortgage loan is now in significant default, due to his inability to repay. Plaintiff suffered the cost of expenses related to preparation of legal defense of foreclosure. Plaintiff's once excellent credit was significantly damaged, and he was subjected to emotional and mental distress caused by his inability to repay.

### Karina Prak v. Bank of America, N.A.

51.      Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

52.      Individual and Representative Plaintiff Karina Prak is a citizen of Massachusetts residing at, and claims to be the rightful owner of 44 Harvard Street, Lowell, MA 01851 which is one of the subject properties referenced herein.

53.      On or about November 21, 2007, Plaintiff purchased said subject property for Two Hundred Forty Five Thousand and 00/100 Dollars ($245,000.00) with Twenty Four Thousand Five Hundred and 00/100 Dollars ($24,500.00) of her own funds as down payment and was given a mortgage loan of Two Hundred Twenty Thousand Five Hundred and 00/100

($220,500.00) by Bank of America, N.A., for the balance of funds required to complete said purchase.

54.     The Deed granting the property to Plaintiff was recorded on November 27, 2007 in the Middlesex County North Registry of Deeds in Book 21768, at page 76. The Mortgage was recorded on November 27, 2007 in the Middlesex County North Registry of Deeds in Book 21768, at page 79.

55.     At the time Plaintiff applied to Defendant Bank America, N.A. for said mortgage loan, she was employed as a "manager" of a nail salon, earning $2,000.00. Defendant Bank of America, N.A. offered to make said mortgage loans by qualifying the Plaintiff using the underwriting criteria of a "Stated Income Verification" mortgage loan product.

56.     By using this negligent underwriting criteria Defendant Bank of America, N.A. was able to state on the mortgage loan application that Plaintiff was earning $4,500.00 per month, thus enabling her to qualify for said mortgage loan.

57.     Defendant Bank of America, N.A., as final underwriter of Plaintiffs mortgage loan application, knew Plaintiff's job description would not reasonably support an income level as stated on her mortgage loan application and that Plaintiff  did not earn enough income to qualify for said loan. By offering, either directly or through correspondent lending partners or mortgage brokers, to underwrite Plaintiff's mortgage loan application, which would not require a true and accurate disclosure of Plaintiff's income, said Defendant could make said mortgage loan reasonably knowing and foreseeing that Plaintiff did not have the ability to repay said mortgage loans, and that future default of said mortgage loans was extremely high.

58.     Typically, good mortgage loan underwriting standards would require that the originating lender determine that a potential borrower's income be realistically stated so as to determine a potential borrower's ability to repay.  As the Plaintiff was earning a gross monthly income of roughly $2,000.00 per month it is reasonably foreseeable that she would be unable to repay $220,500.00 in mortgage loan obligation, based on her job description at

the time of application for said mortgage loans. In approving Plaintiff for said mortgage loans Bank of America, N.A. negligently exposed Plaintiff to substantial risk of loss.

59.     Originator Defendant Bank of America, N.A. knew Plaintiff lacked the ability to reasonably repay said mortgage loans, and knew Plaintiff's lack of income would impair her ability to repay said mortgage loan. However, Bank of America, N.A. recklessly and negligently developed, offered, and otherwise made available to the public, directly or through correspondent lender partners of mortgage brokers, a high risk mortgage product specifically tailored to Plaintiff's situation.

60.     At best the Plaintiff is an unsophisticated consumer who could be easily taken advantage of by the issuance of a hi-risk mortgage lending instrument to her. Knowing these facts, Bank of America, N.A. reduced its underwriting standards and developed a high-risk lending instrument specifically tailored to the Plaintiff's situation (and others so similarly situated) so as to make said loan to enrich themselves by negligently and recklessly offering said mortgage loan to Plaintiff and others.

61.     Bank of America, N.A. owed Plaintiff a duty of reasonable care to ensure that high risk, poorly underwritten mortgage loan products would not expose her to substantial risk of loss. Instead, Bank of America, N.A. negligently and recklessly offered said mortgage loan to Plaintiff, regardless of her ability to repay, knowing and reasonably foreseeing that Plaintiff would be exposed to substantial risk of loss.

62.     Plaintiff relied on Bank of America, N.A.'s reasonable duty of care to ensure that she would not be offered mortgage loans that would expose her to a reasonably foreseeable substantial risk of loss.

63.     Plaintiff acted on this reliance by accepting the mortgage products offered to her, and was exposed to substantial risk of loss, thus such reliance was to her detriment.

64.     Plaintiff was harmed by Bank of America, N.A.'s negligent mortgage product offerings. Plaintiff's mortgage loan eventually became in significant default, due to her inability to repay. Plaintiff suffered the cost of expenses related to legal defense of

13

foreclosure. Plaintiff's once excellent credit was significantly damaged, and she was subjected to emotional and mental distress caused by her inability to repay, and eventual foreclosure action against her.

### C.   CLASS ALLEGATIONS AS TO ORIGINATOR DEFENDANTS

65.     Plaintiffs' repeat and re-allege every allegation above as if set forth herein in full.

66.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

67.     The named Plaintiffs sue on behalf of themselves and all homeowners whose loans have been originated, since January 1, 2002 and through December 31, 2008, by the Originator Defendants negligently, recklessly and knowingly using reduced underwriting standards and extremely high risk mortgage loan products, offered and made available to Plaintiffs and other borrowers, directly and/or through mortgage brokers and correspondent lender partners, that were designed to allow unsophisticated and unqualified borrowers to obtain mortgages without proper verification of income or down payment, and offering of mortgage products such as; a) interest only or negative amortization payment option mortgage loans, b) stated income or no income verification sub-prime credit mortgage loans, c) little or no down payment mortgage loans, and d) high risk adjustable rate mortgage loans with extremely low initial start rates, underwritten with extremely low credit score, high loan to value and debt to income ratio allowances, regardless of Plaintiffs and other borrowers ability to repay, that the Originator Defendants knew, and reasonably foresaw, would be unsustainable for those borrowers and expose them to substantial risk of loss.

68.     Plaintiffs and others relied on the Originator Defendants financial expertise, advice, counsel, and reasonable duty of care to not expose potential borrowers of mortgage loans to significant risk of loss, when Plaintiffs and others applied for mortgage loans, and such reliance was to Plaintiffs and others detriment.

69.     Plaintiffs and others acted on said reliance on the Originator Defendants financial expertise, advice, counsel, and duty of care, by seeking, applying for, and being granted

mortgage loans that were designed to allow unsophisticated and unqualified borrowers to obtain mortgages loans, using negligent underwriting standards and high risk mortgage terms, regardless of their ability to repay, thus exposing Plaintiffs and others to substantial risk of loss.

70.     Plaintiffs and other borrowers were owed a reasonable duty of care, by the Originator Defendants, when they offered their mortgage products, to ensure that Plaintiffs and others were not exposed to substantial risk of loss. The Originator Defendants were negligent in that duty and breached said duty by knowingly exposing Plaintiffs and others to substantial risk of loss.

71.     The Originator Defendants negligence caused Plaintiffs and others harm which was reasonably foreseeable.

72.     Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, loss of property interest, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving and relocation expenses.

73.     Plaintiffs and others have suffered general damages such as negative impact to credit ratings, extreme emotional distress as the result of being threatened with foreclosure, and eventual loss of their homes.

74.     Plaintiffs seek punitive damages on behalf of themselves and others so similarly situated.

75.     Plaintiffs claim on behalf of themselves and others so similarly situated that the Originator Defendants' actions, as stated herein above, were the direct cause of the reasonably foreseeable harm they suffered. Plaintiffs and others relied on the financial expertise of the Originator Defendants when they offered these mortgage products to the public, and Plaintiffs and others then acted on that financial expertise and offering to their detriment, by seeking, applying for, and being granted unsustainable mortgage loans, and it is fair, just and reasonable to impose liability upon the Originator Defendants as named herein.

76.     Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, the Defendants' current employees and current or former officers, directors, agents, representatives, their family members, the members of this Court and its staff.

77.     Plaintiffs do not know the exact size or identities of members of the Class, since such information is in the exclusive control of Defendants.  Plaintiffs believe that the Class encompasses tens or hundreds of thousands of individuals whose identities can be readily ascertained from Defendants' books and records.  Therefore, the Class is so numerous that joinder of all members is impracticable.

78.     All members of the Class have been subject to and affected by the same conduct. There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the class.  These questions include, but are not limited to the following:

> a.     the nature and scope of the Originator Defendants' negligent offering and/or otherwise making available to the public high risk mortgage loans, underwritten with negligent underwriting standards, designed to allow unsophisticated and/or unqualified borrowers to obtain mortgage loans, regardless of their ability to repay;
>
> b.     whether the Originator Defendants' conduct herein amounts to negligence in their duty of care to Plaintiffs, and whether resulting harm done, as claimed by Plaintiffs, was reasonably foreseeable;
>
> c.     whether the Court can order damages and enter injunctive relief.

79.     The claims of the Named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the class in that the Named Plaintiffs and the other members of the class were subject to the same conduct.

16

80.     The named Plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the class claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

81.     A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

82.     This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

83.     The Defendants acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

     **D.     CAUSE OF ACTION**

**COUNT I**
**As to the Originator Defendants**
**Negligence**

84.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

85.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

86.     Plaintiffs and others suffered damages as a result of the Originator Defendants' originating residential mortgage loans whereby the Originator Defendants negligently, recklessly and knowingly used reduced underwriting standards and extremely high risk mortgage loan products, offered and made available to Plaintiffs and other borrowers, directly and/or through mortgage brokers and correspondent lender partners, that were designed to allow unsophisticated and unqualified borrowers to obtain mortgages without proper verification of income or down payment, and offering of mortgage products such as; a) interest only or negative amortization payment option mortgage loans, b) stated income or no income verification sub-prime credit mortgage loans, c) little or no down payment mortgage

loans, and d) high risk adjustable rate mortgage loans with extremely low initial start rates, underwritten with extremely low credit score, high loan to value and debt to income ratio allowances, regardless of Plaintiffs and other borrowers ability to repay, that the Originator Defendants knew, and reasonably foresaw, would be unsustainable for those borrowers and expose them to substantial risk of loss.

87.     Plaintiffs and other borrowers were owed a reasonable duty of care, by the Originator Defendants, when they offered their mortgage products, to ensure that Plaintiffs and others were not exposed to substantial risk of loss. The Originator Defendants were negligent in that duty and breached said duty by knowingly exposing Plaintiffs and others to substantial risk of loss.

88.     The Originator Defendants negligence caused Plaintiffs and others harm which was reasonably foreseeable.

89.     Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving and relocation expenses.

90.     Plaintiffs and others have suffered general damages such as loss of property interest, negative impact to credit ratings, extreme emotional distress as the result of being threatened with foreclosure, and eventual loss of their homes.

91.     Plaintiffs seek punitive damages on behalf of themselves and others so similarly situated.

92.     Plaintiffs claim on behalf of themselves and others so similarly situated that the Originator Defendants' actions, as stated herein above, were the direct cause of the reasonably foreseeable harm they suffered. Plaintiffs and others relied on the financial expertise of the Originator Defendants as prominent, reputable mortgage lending institutions, when they offered these mortgage products to the public, and Plaintiffs and others then acted on that financial expertise and offering, to their detriment, by seeking, applying for, and being granted

unsustainable mortgage loans, and it is fair, just and reasonable to impose liability upon the Originator Defendants as named herein.

93.     As a result of their negligence, the Originator Defendants caused Plaintiffs and others harm, as alleged above.  The Originator Defendants' bad faith was thus to Plaintiffs' and others detriment.

## V.     SERVICER DEFENDANTS

### A.     FACTS

#### i.)     General Background

94.     The residential mortgage servicing industry was created decades ago when mortgage lenders designed a standardized system by which they could securitize mortgages and thereby recapitalize their lending capability, after having lent out the majority of their capital, much faster than waiting years for borrowers to pay off their mortgages. The premise was simple enough; a mortgage originator makes a large number of loans. That originator pools the loans into one large grouping known as a "pool of mortgages". That pool of mortgages is then sold to a Real Estate Mortgage Investment Conduit (REMIC). These REMICs are often named and referred to as Trusts. They are legal entities registered with the Securities and Exchange Commission. However, they are merely "shells" created for the sole purpose of acquiring the pools of mortgages, which become assets of the respective Trusts.

95.     The creation of this "mortgaged backed Trust" concept allows mortgage originators to get the loans it recently made off their books. They no longer have ownership of the mortgages and notes they pooled together and consequently become recapitalized, giving originators the ability to lend again, in months as opposed to years. Originators also obtain the added benefit that should mortgages default and eventually fail, they suffer no financial consequences as they no longer retain any ownership interest in those mortgages and notes that have been pooled and sold to Trusts.

96.     Trusts are inherently faced with two problems from the moment of their creations. First, because they are just "shells" (they have no physical address, no communications

capability, and no personnel), they have no capital to pay for the pools of mortgages, and secondly, for the same reason as aforementioned, they have no personnel to service the mortgage accounts.

97.      The first problem is solved by the securitization of the Trust's assets. This is done by selling bonds (sometimes referred to as certificates) commonly called Residential Mortgage Backed Securities (RMBS) or simply Mortgage Backed Securities (MBS) to big investors such as pension funds, retirement funds, etc.

98.      The second problem is solved by paying companies (i.e. the Servicer Defendants) to deal with the day to day handling of mortgage servicing related matters such as collecting monthly principal and interest payments, paying taxes and insurance, etc.  Thus the necessity of keeping the Trusts as separate entities, in order for the recapitalization of mortgage originators to be accomplished through securitization, gave rise to the mortgage servicing industry.

99.      When a securitization of mortgages takes place many documents are created to outline the duties of the various participants of each securitization. These documents include required forms that must be filed with the SEC and those that are not. Those documents relevant to this complaint are the Prospectus and/or Prospectus Supplement, and the Pooling and Servicing Agreement.

100.      The Prospectus and/or Prospectus Supplement are documents, registered with the SEC, outlining the entire structure of a mortgage backed Trust's securitization. Their topics range from descriptions of the mortgages in the pool, who originated those mortgages and under what circumstances, who the Trustee of said Trust shall be and their duties, the delivery of the mortgages and notes to the Trust, The Certificates (bonds) offered for sale, monthly payments to the Certificate holders (bond holders), and who the servicer will be at the inception of the Trust as well as the servicer's duties. The Prospectus and/or Prospectus Supplement is the document given to potential purchasers of the MBSs being offered for sale

by the Trust in much the same manner that a company going public issues a prospectus prior to the issuance of its stock on a public exchange.

101.     In a Prospectus and/or Prospectus Supplement another document is referenced called a Pooling and Servicing Agreement (PSA). The majority of the clauses contained in the PSA are contained in the Prospectus and/or Prospectus Supplement as the PSA is a contract between the Trust and the servicer and is not necessarily required to be registered with the SEC, so long as its relative content, as it relates to the financial impact it has on said Trust, is disclosed in full within the Prospectus and/or Prospectus Supplement.

102.     As stated in all Prospectus and/or Prospectus Supplements, mortgage servicers are paid by Trusts to service the Trust's mortgages, and part of payment for the performance of these services is based as a percentage of the total amount of principal balance of all the loans in a given pool of mortgages the servicer services (i.e. $1,000,000,000 in pool principal balance @ .5% = $5,000,000 servicing fee).

### ii.)     Government Assistance - Background

103.     Once the Real Estate Market suffered the inevitable nationwide collapse resulting from the negligent underwriting practices of the Originator Defendants, much of the focus of the government was to find a way to assist homeowners in danger of losing their homes.

104.     To that end, Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act").  12 U.S.C. § 5201 (*et seq.*) (2009).

105.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."

106.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP.  12 U.S.C. § 5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions.

107.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP.  12 U.S.C. § 5225.

108.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities."  12 U.S.C. § 5213(3).

109.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures."

110.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C. § 5220.

111.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

112.     The Making Home Affordable program consists of two subprograms.  The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

113.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.  It is the exploitation of this subprogram that is an important component of the overall fraudulent scheme perpetrated on the named Plaintiffs herein and millions of others, by the Servicer Defendants.

### iii.)     Fraudulent Scheme of Servicer Defendants

114.     On April 17, 2009, the Bank of America, N.A. became a participating servicer of the United States Treasury Department's Making Home Affordable Program (of which HAMP is a subsidiary program), agreeing to follow the guidelines and supplemental directives of the aforementioned programs.

115.     When Bank of America signed the SPA with the U.S. Treasury, they agreed in their capacity as loan servicer to participate in HAMP, to abide by HAMP's requirements, and to perform loan modification and other foreclosure prevention services described in the program guidelines and supplemental directives.

116.     Once agreeing to participate in HAMP, Bank of America launched public awareness campaigns via various media to let Plaintiffs, and other borrowers of mortgage loans they serviced, know that assistance in modifying their mortgages was readily available to them.

117.     The BOA Defendants' mailed scores of notices offering assistance to Plaintiffs and others, posted links on their web sites offering modification assistance, easy access to information regarding modification assistance, encouraged Plaintiffs and others in those notices and on those web sites, to apply for modification, that their servicer wanted to help Plaintiffs and others.

118.     In these offers of assistance, the BOA Defendants, made representations such as, but not limited to: a) that they offered modification programs, including the federal government's HAMP, b) that they "encouraged" borrowers to apply for a loan modification,  c) that they wanted to "help" borrowers, and d) that they wanted to make borrowers mortgage payments "more affordable".

119.     Through their various offers of assistance and their agreeing to participate in the HAMP program, the BOA Defendants represented to Plaintiffs they would properly review and respond in good faith to Plaintiffs' requests for modification assistance.

120.     Plaintiffs accepted and acted on these offers of assistance, by applying for modification of their mortgage loan, and further relied on representations that BAC Home

Loans Servicing, LP (their mortgage servicer) would assist them, in good faith, by following HAMP Guidelines.

121.    However, when the HAMP Program was introduced, the CEOs of the BOA Defendants and their senior management teams, recognized right away that HAMP and all manner of mortgage loan modification requests could become an integral part of an overall fraudulent scheme to unfairly earn billions of dollars in illicit profits from servicing defaulted mortgage loans by exploiting Plaintiffs and other borrowers modification requests, by using them to keep millions of mortgages in a perpetual default status.

122.    In this fraudulent scheme the applicant Plaintiffs and other borrowers are met with a daunting challenge of misinformation, lost document claims, repetitive requests for documents already supplied and all manner of tactics designed to purposefully stall or otherwise hinder the modification application process, as a matter of policy, approved by the CEOs of the BOA Defendants, while being used as unwitting pawns during futile attempts at modification.

123.    In facilitation of this fraudulent scheme, the CEOs and the senior management teams of the BOA Defendants approved, condoned and allowed to be executed corporate policies that allowed for their companies agents to; a) falsely deny receiving documents from Plaintiffs and others when applying for modification consideration, b) lie to Plaintiffs and others regarding their eligibility for modification, c) intentionally force Plaintiffs and others to wait months or years before determining and communicating modification eligibility, d) purposely fail to communicate deadlines, incompleteness of documentation, status of modification requests and risk of eligibility loss to Plaintiffs and others, e) purposefully fail to properly review Plaintiffs' and others requests for modification assistance, f) falsely deny eligibility when eligibility should have been granted, g) and purposefully allow Plaintiffs' and others modification documents to continually expire, requiring resubmission, in a deliberate effort to keep their mortgage loans in a near perpetual state of default all as part of a well organized

fraudulent scheme to increase corporate profit through gains from the  servicing of defaulted mortgage loans.

124.     This fraudulent scheme was accomplished by the combined exploitation of the HAMP Program, borrower modification requests in general, and manipulation of the Pooling and Servicing Agreements governing the contractual obligations of, and payment for services rendered to, the BOA Defendants regarding the pools of mortgages they service for the Trusts that own said pools.

125.     The BOA Defendants purposefully hindered the modification process to keep Plaintiffs and other modification applicant borrowers in a near perpetual state of default, so as to exploit pools of mortgages for maximal profitability, keeping the total amount of principal balance of the pool artificially inflated thereby maximizing the amount of the servicing fees collected from servicing of those defaulted mortgage loans.

126.     Were the BOA Defendants to simply foreclose on all borrowers as soon as good servicing practices would dictate, the servicing fees they collect would drop as suddenly and dramatically as the principal balance of the mortgages in said pools. Instead they purposefully and willfully delay foreclosure, by manipulating and hindering Plaintiffs' and others attempts at modification, with no intent whatsoever of modifying those mortgages, so as to lower servicing income in a controlled manner and maximize profits from servicing income for as long a time as is possible.

<strong>iv.)     Servicers Financial Incentives Against Modification</strong>

127.     There are a number of financial factors that make it far more profitable for the BOA Defendants to avoid modification, continue to keep a mortgage in a semi-permanent state of default or distress, and to eventually push loans toward foreclosure or short sale.

128.     Stipulated in all Prospectus and/or Prospectus Supplements is a requirement that servicers must forward, from their own funds, monthly payments of principal and interest, less the servicing fees, to the Trusts on all mortgages in a given pool of mortgages, including those payments of non-performing loans and REO properties. These payments are called periodic

advances or simply "advances". There are also other types of servicing advances required to be made by servicers stated in Prospectus' and/or Prospectus Supplements including, but not limited to, property inspections, broker price opinions, appraisals, property management and maintenance, legal fees, service processing, etc.

129.    Further stated in all Prospectus' and/or Prospectus Supplements, advances made by a servicer are recoverable by the servicer through either standard collection practices (from the borrower) or once a property, as security for a mortgage in the pool, is foreclosed on and the property (now considered Real Estate Owned or REO property of the Trust) is eventually liquidated. In the case of a liquidation of a property, the servicer is paid as first order of priority from the proceeds of said liquidation. Furthermore, recovery of advances often includes interest on the funds advanced enabling the Servicer Defendants to actually earn interest income from their advances made.

130.    Entering into a permanent modification will often significantly delay a servicer's ability to recover advances it is required to make to a Trust as compared to the aforementioned foreclosure/liquidation scenario.  This is due to the practice of adding those advances to the principal balance of the loan when a modification is made, thereby spreading out the recovery of those advances by the servicer, over the life of the loan. Also, a servicer's right to recover expenses from a Trust in a loan modification, rather than a foreclosure, is less clear and less generous. Considering that mortgage servicers are only interested in their own respective profitability (having no ownership interest in the Trust's assets), they are greatly incentivized against modification even further by these pooling and servicing agreement requirements.

131.    Moreover, by exploiting loopholes in pooling and servicing agreements, the BOA Defendants' profit handsomely by routinely using the "borrower is applying for a modification" excuse to justify delaying the foreclosure of defaulted mortgages to Trusts, for a time lengthily enough to incur a significant amount of aforementioned servicing advances, and foreclosing when defaults have effectively "ripened", making full recovery of said advances, often with interest. This is done by stringing along borrowers' attempts at

modification, as aforementioned in preceding paragraphs, so as to justify the time delay to the Trusts, used primarily to allow the bill for servicing advances to pile up. Furthermore, this reimbursement structure limits a mortgage servicer's incentive to rein in foreclosure costs and actually incentives them to increase and pad the costs of foreclosure.

132.    Servicers will charge for unnecessary work and/or work that was never done (referred to in the mortgage securitization industry as "Junk Fees in an effort to increase the costs of foreclosure and subsequently the amount of servicing advance fees recovered when a foreclosure and liquidation of property eventually takes place.

133.    This is all a clever, fraudulent, misleading, and deceptive balancing act employed by the BOA Defendants to maximize profits using Plaintiff borrowers and others as unwitting pawns when they applied for modification assistance. While the BOA Defendants are making servicing advances, they appear to be losing money on the foreclosure process, yet this is offset later when recovery is made (after foreclosure and final liquidation of property) and profit is realized from the recovery of all the necessary, unnecessary, and fraudulent servicing advances claimed to be paid out by the BOA Defendants, plus interest.

134.    These advances are recovered by the Defendant Servicers as the first order of payment priority from sale proceeds upon liquidation (sale by the Trust) of a foreclosed property. To the Servicer Defendants, advances they are required to make with respect to defaulted mortgages, as stated in the pooling and servicing agreements with the Trusts for which they service mortgages for, are quite literally like "money in the bank".

135.    It is by employing these types of fraudulent, deceptive, and misleading business practices, by exploiting loopholes in the pooling and servicing agreements they are contractually bound to adhere to, and using the modification requests in tandem to cover their tracks, the Servicer Defendants have made obscene profits from the servicing of defaulted residential mortgage loans while knowingly causing significant harm to the named Plaintiffs and millions of other homeowners, the bond-holders of the Trusts for which they service mortgages for, and the public's economic well being at large.

136.    This was done at the expense of the Plaintiffs and other borrowers applying for modifications that are given false hope and suffer the indignities of significant emotional and mental distress during laborious, lengthy, and futile attempts in seeking modification assistance.

### v.)    Contractual Restrictions and Modification

137.    Furthermore, the Servicer Defendants purposefully delayed and kept in abeyance (in furtherance of the aforementioned fraudulent scheme) many Plaintiffs and others modification applications, over months and even years, while full well knowing that they could not possibly modify those homeowners mortgages due to mortgage modification restrictions and/or prohibitions against modifications as specified in the Prospectus' and Prospectus Supplements, and Pooling and Servicing Agreements governing the mortgages in the Trusts they serviced mortgages for.

138.    The aforementioned restrictions are typically part of every securitization of residential real estate mortgages as a method of protecting the integrity of the revenue stream paid to investors which purchased the Residential Mortgage Backed Securities (RMBSs) of given securitization. If a large enough percentage of mortgages in a given pool are modified then there will not be enough revenue to cover the payments due RMBS holders.

139.    After a certain number of modifications are performed in said pool of mortgages (as governed by the terms of its PSA) there becomes less and less money to pay the bond holders. When this begins to happen it becomes "*materially adverse*" to said Trust to modify any other mortgages in the pool. As a modification of borrower's mortgages as allowed by the aforementioned federal modification program would result in a violation of the section of the aforementioned PSA regarding modifications, any mortgage governed by the aforementioned PSA is highly unlikely to be modified after the *materially adverse* mathematical tipping point is reached.

140.    Moreover, the securitizations of some mortgage pools are extremely complex. In some Trusts, the mortgage pools and Servicers are of the multi-party variety. Trusts are

created, that purchase several mortgage sub-pools consisting of loans originated by various Originators.

141.     The loans are placed into different pools all governed by the same Prospectus and owned by the same Trust. The companies originating these loans are given the servicing rights to the loans they originated.

142.     Trusts of the multi-party variety are made up of approximately a billion dollars worth of mortgage loans or more, mostly of the sub-prime variety, all with an expected high non-performance rates. The Mortgaged Backed Securities issued by this type of Trust to pay for said pools of mortgages are usually purchased by one entity which then repackages said Mortgage Backed Securities in a second securities offering through another Trust backed, not by the original pools of mortgages, but by the Mortgaged Backed Securities of the original Trust themselves. This would mean that modifications of mortgages in any of the three pools of mortgages combined in this Trust would not only be materially adverse to the original Trust and its Bond-holders but also to the second Trust backed by the Bonds of the First Trust as well.

143.     This "synthetic" type of Mortgage Backed Securities offering not only makes it more complex but creates a situation whereby most, if not all mortgages in a Trust of this type are impossible to modify due to the small and/or non-existent margin of loss allowed to cash flows of each Trust in order to ensure payments can be made to the inextricably linked bond-holders of each Trust. As such, modifying any given mortgage would create the "*materially adverse*" condition to the Trust, as stated in the foregoing Prospectus Supplement, making modification of mortgages in the pools a practical impossibility.

144.     Additionally, there are also sections (clauses) in most Prospectus' which restrict the ability of the servicer to modify a given mortgage a mortgage pool unless the servicer repurchases the loan from the Trust which owns it. This event is highly unlikely to take place, given the Servicer Defendants' proclivity for selling mortgages to recover capital to begin with.  Furthermore, the Servicer Defendants would almost certainly not willingly repurchase a

loan that would be in default (or one whereby a reasonably foreseeable default is predicted) and as a result the servicer of mortgage loans in this type of Trust, would not modify any of the loans held in those types of Trusts, as the repurchase of those loans would not be profitable.

145.    Some Trusts' Prospectus' have sections (clauses) restricting the ability of the servicer to modify a given mortgage in the pool if the interest rate of the mortgage is permanently lowered. As example, if a mortgage has an interest rate of 6.25%, fixed rate for 30 years, a modification of said mortgage, as allowed by the aforementioned federal modification program, would initially reduce the rate of this mortgage over a five year time span after which time the rate will then gradually increase one percent per year and be capped at the current Freddie Mac Weekly Primary Mortgage Market Survey (PMMS) for 30 year fixed rate conforming loans, rounded to the nearest 0.125%, as of the date such modification agreement is prepared. For the week of August 4, 2011, this rate was 4.39%. As such, there is reasonable belief that modifying a mortgage owned by a Trust with this type of restrictive clause stated in its Prospectus, would be unlikely to be modified.

146.    Some Prospectus' and PSAs are less restrictive but still limit a servicer's ability to modify a certain number of loans in a Trust. The reasons for this are that after a certain number of modifications are performed in a given pool of mortgages there becomes less and less money to pay the bond holders. When this begins to happen it becomes *materially adverse* to modify any other mortgages in the pool. As a modification of mortgages as allowed by the HAMP program would result in a violation of the PSAs already in existence any mortgage governed by a standard private label PSA is highly unlikely to be modified if prohibited by the existing PSA and/or after the aforementioned tipping point of adverse effect on cash flow is reached in a PSA restricting modification.

147.    To compound the problems presented by this situation, Prospectus' and/or PSAs require 100% of the bond holders consent in order to change the terms of a Prospectus or PSA. As a typical mortgage securitization results in thousands of bonds being sold globally, it

is practically impossible to obtain 100% consent regarding any issue once the securitization is complete. As consent of 100% of the Bondholders is needed to alter the Prospectus and/or PSA in a manner that would affect the Trust's cash-flow, as would certainly be the case as a result of widespread modifications to the underlying mortgages, the required consent to change the terms of a Trust is an event with a near zero probability of occurring.

148.     Lastly, the previous problem becomes even more complex when synthetic collateralized mortgage obligations (SCMO) are taken into consideration. Bonds issued by a mortgage backed Trust (often called collateralized mortgage obligations or CMO) are often divided into what are called Tranches. Each of these Tranches represents a different payment/risk priority tier, each of which has a different rate of revenue, dividend and/or credit rating. The riskiest Tranches are not investment grade and as such cannot be sold to entities like pension and mutual funds, which make up the profile of a large percentage of purchasers of RMBS Bonds. Therefore, these non-investment grade Bonds are often re-securitized into what are called synthetic collateralized mortgage obligations (SCMO). These SCMOs are a securitization in which the assets of the SCMO are the RMBS Bonds issued by a CMO, rather than the underlying mortgages of said CMO. Despite the fact that a SCMO is nothing more than the repackaging of the riskiest Tranches of other CMOs, bonds issued by a SCMO are also divided into Tranches with similar payment/risk priority tiers.

149.     The process is again repeated and the worst of the worst is repackaged as SCMO2. This process can be repeated (and often is) an endless number of times thereby making it practically impossible to obtain consent of 100% of Bondholders necessary to change the terms of a Trust, Prospectus or PSA.

150.     As such, for those Plaintiffs and other homeowner modification applicants whose mortgages were owned by Trusts governed by PSAs with merely restrictive clauses regarding modification, the first initial modification applicants received modifications and those applying at a point in time when further modifications of loans in that pool would affect cash flows to bond holders, were simply purposefully left in limbo by the Servicer Defendants,

serving the dual purpose of falsely appearing to be assisting modification applicants in good faith, while actually maximizing servicing fees and recoverable servicing expenses as part of the aforementioned fraudulent scheme.

151.    For those Plaintiffs and other homeowner modification applicants whose mortgages were owned by Trusts, governed by PSAs with clauses prohibiting modification, the Servicer Defendants never had any intention of modifying their mortgages due to the existence of contractual prohibitions against modification, contained in the PSAs governing the servicing of those mortgage loans.

152.    In spite of knowing these Plaintiffs and other borrowers could not possibly modify their mortgages, the Servicer Defendants used all manner of tactics, as described herein, to hinder the modification application process, and leave these Plaintiffs' and other borrowers defaulted mortgage loans in abeyance, without communicating modification eligibility to them, in furtherance of the aforementioned fraudulent scheme, for months and even years.

153.    The Servicer Defendants knew that mortgages of the Plaintiffs' and others could not be modified and instead of notifying them of the impossibility of fulfilling their request in a timely manner, the CEOs of the Servicer Defendants and their senior management teams approved, condoned and allowed to be executed corporate policies that allowed for their companies agents to; a) falsely deny receiving documents from Plaintiffs and others when applying for modification consideration, b) lie to Plaintiffs and others regarding their eligibility for modification, c) intentionally force Plaintiffs and others to wait months or years before determining and communicating modification eligibility, d) purposely fail to communicate deadlines, incompleteness of documentation, status of modification requests to Plaintiffs and others, e) purposefully fail to properly review Plaintiffs' and others requests for modification assistance, f) purposefully allow Plaintiffs' and others modification documents to continually expire, requiring resubmission, and employ all manner of hindering the modification process by design in order to keep applicants in abeyance, in a deliberate effort to keep their mortgage loans in a near perpetual state of default.

154.     Some of the Plaintiff  modification applicants and others suffered the additional indignity of being granted modifications and/or trail period plans, only to later discover that those modifications and trial period plains would not be honored by the Servicer Defendants

155.     The Plaintiffs, other borrowers, and the bond-holders of the various Trusts are left holding the bag in the end, when foreclosure finally takes place, and the property is liquidated for a fraction of the mortgages' value, while the Servicer Defendants reap billions of dollars in profits derived from illicit servicing fees based on values of pools of mortgages that have been artificially inflated by the Servicer Defendants' fraudulent, willful, and purposeful false representations to be offering assistance to Plaintiffs and others in good faith when they applied for modification of their mortgage loans.

156.     The identities of the CEOs of the Servicer Defendants who instituted, condoned and/or otherwise approved their respective organizations policies, and caused to be executed the aforementioned fraudulent scheme and misconduct as noted herein, are as follows;

|      |                 |                          |
|------|-----------------|--------------------------|
| i.   | Brian Moynihan  | Bank of America & its subsidiaries |
| iii. | Kenneth D. Lewis| Bank of America & its subsidiaries |
| iv.  | Ken Scheller    | BAC Home Loans Servicing, LP |

157.     By early 2012, many of the Servicer Defendants had become infamous for their settlements of claims regarding alleged misconduct during the modification and foreclosure process. Many of the Servicer Defendants are now the subject of Consent Orders issued by the Office of the Comptroller of the Currency for alleged misconduct regarding their loss mitigation and foreclosure practices, some have been fined and denied payment for improprieties alleged regarding their administration of HAMP, the top five mortgage servicers settled claims brought by the 50 states Attorneys General Nationwide Mortgage Settlement, and Bank of America and JP Morgan Chase Bank have settled claims with the United States,

amounting to billions of dollars, brought by *qui tam* actions filed and made part of the 50 States Attorneys General Nationwide Mortgage Settlement regarding alleged fraudulent misconduct during the modification process which mirror Plaintiffs claims in this action (Exhibit).

158.     Although all of these actions and settlements resulted in no admissions of wrongdoing on the part of those Servicers, it is all too clear that the misconduct complained of in those actions, as well as in this action, not only took place, but would still be continuing, had significant monetary penalties and stringent government oversight not been implemented.

### B.     NAMED PLAINTIFFS' FACTS & ALLEGATIONS

**Morcos H. Hanna & Suzan H. Andraus v. Bank of America, N. A. &**

**BAC Home Loans Servicing, LP**

159.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

160.     Plaintiff Morcos H Hanna & Suzan H. Andraus are citizens of the State of Massachusetts residing at, and claim to be the rightful owner of 22 A-B Montvale Avenue, Stoneham, MA 02180, which is the subject property incorporated and referred to herein.

161.     On or about August 6, 2003, Plaintiffs gave a first Mortgage and Note to Countrywide Home Loans, Inc. in the original principal amount of $300,000.00, and a second Mortgage and Note to Countrywide, in the original principal amount of $30,000.00, secured by said subject property. Said mortgages were recorded in the Middlesex South County Registry of Deeds, on August 7, 2003, in Book 40362, at page 443 and 447, respectively.

162.     Countrywide Home Loans retained the servicing rights to Plaintiff's mortgage loan which subsequently became to be serviced by Servicer Defendant BAC Home Loans Servicing, LP, as successor in interest to Countrywide.

163.     On or about January 2010, Plaintiffs experienced financial hardship which caused them to be unable to make their mortgage payments.

164.     On or about February 23, 2010 and March 8, 2010, Plaintiffs received an offer of modification assistance, via mail, from Ken Scheller, Senior Vice President, Home Retention

Division of BAC Home Loans Servicing, LP (BAC), servicer of Plaintiffs' mortgage. Said offer represented that BAC was offering the federal government's HAMP, encouraged Plaintiff to apply for modification assistance, and that BAC would assist Plaintiffs. Plaintiffs also visited Bank of America's website, which further offered modification assistance and represented that they would in good faith help Plaintiffs, and further encouraged Plaintiffs to apply for modification.

165.     Additionally, both letters offering modification assistance stated *"It is important to remember that after you contact us, if your loan is in foreclosure we will not conduct a foreclosure sale while we determine your eligibility for the Home Affordable Modification Program."*

166.     Plaintiffs relied on these good faith representations and made an application to the Defendant BAC Home Loans Servicing, LP, for consideration for their mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to their hardship on or about March 24, 2010.

167.     Plaintiffs then received a modification application package from BAC, via Federal Express, requesting that the documents inside said package be filled out and returned by Plaintiffs, along with personal financial information, tax information, and a statement attesting to their hardship.

168.     Plaintiffs' complied with this additional request and did return said modification application package, with the documents requested, to BAC on or about April 15, 2010.

169.     Plaintiffs then received another modification application package from BAC, via Federal Express, requesting that the documents inside said package be filled out and returned by Plaintiffs, along with personal financial information, tax information, and a statement attesting to their hardship.

170.    Plaintiffs' complied with this additional request and did return said modification application package, with the documents requested, to BAC on or about May 21, 2010.

171.    This pattern of Plaintiffs' sending modification documents to BAC and then receiving a request, from BAC, to re-submit documentation already provided by Plaintiffs, happened over and over again until June 3, 2011, when Plaintiffs mortgage loan was foreclosed and the subject property was sold at auction.

172.    Up until said foreclosure auction date referenced above, Plaintiffs were told by BAC customer service representative that Plaintiffs were being considered for a HAMP Modification and that BAC would not foreclose prior to determining eligibility.

173.    During the entire one year and three months since Plaintiffs first applied for the HAMP program they suffered extreme emotional and mental distress as the customer service agents of BAC, acting on corporate policy approved, condoned and ordered executed by the CEO and senior management executives of the Bank of America Servicer Defendants, did in fact; a) falsely deny receiving documents from Plaintiffs when applying for modification consideration, b) lie to Plaintiffs regarding their eligibility for modification, c) intentionally force Plaintiffs to wait months before determining and communicating modification eligibility, d) purposely fail to communicate deadlines, incompleteness of documentation, status of modification requests to Plaintiffs, e) purposefully fail to properly review Plaintiffs' requests for modification assistance, f) purposefully allow Plaintiffs' modification documents to continually expire, requiring resubmission, g) lie to Plaintiffs' regarding written and verbal promises to not foreclose on Plaintiffs' mortgage while modification eligibility was being determined, and employ all manner of hindering the modification process by design in order to keep Plaintiff's request for modification assistance in abeyance, all as part of a well organized fraudulent scheme to increase corporate profit through gains from the  servicing of defaulted mortgage loans.

174.     On July 16, 2010, Harmon Law sent Plaintiffs notice they had been retained by Defendant BAC Home Loans Servicing, LP to foreclose Plaintiffs' mortgage, while Plaintiffs were being considered for HAMP eligibility.

175.     On May 3, 2011, Harmon Law sent Plaintiffs a Notice of Mortgage Foreclosure Sale on behalf of Defendant BAC Home Loans Servicing, LP stating a scheduled auction date of June 3, 2011.

176.     On June 3, 2011, Defendant BAC Home Loans Servicing, LP purchased the subject property at said mortgage foreclosure auction for Two Hundred Nine Thousand Two Hundred Eleven and 00/100 dollars ($209,211.00).

177.     On June 29, 2011, Defendant BAC Home Loans Servicing, LP assigned their rights, title and interest in their bid at said auction of the subject property, to Federal Home Loan Mortgage Corporation.

178.     The BOA Defendants' fraudulently misled Plaintiffs with their offers of good faith modification assistance and instead hindered their legitimate request for modification assistance, so as to maximize servicing income and servicing expenses by keeping their modification request in abeyance.

179.     Plaintiffs' relied on the BOA Defendants' good faith offers of modification assistance. Rather than assist Plaintiffs, the BOA Defendants' purposefully hindered their modification request as aforementioned.

180.     Plaintiffs' accepted and acted on those offers of assistance, by applying for modification of their mortgage loan, and such reliance was reasonable. Plaintiffs' relied on these offers of assistance that they would actually be assisted with their modification request, and further relied on the BOA Defendants' good faith offers of assistance, to follow HAMP Guidelines when applying for modification of their mortgage loan and such reliance was to Plaintiffs' detriment as aforementioned.

181.     Plaintiffs were owed a reasonable duty of care, by the BOA Defendants, when they offered modification assistance, to ensure that Plaintiffs were not exposed to substantial risk

of loss. The BOA Defendants were negligent in that duty and breached said duty by knowingly exposing Plaintiffs to substantial risk of loss.

182.     The BOA Defendants' negligence caused Plaintiff harm which was reasonably foreseeable.

183.     Plaintiffs suffered quantifiable damages such as loss of equity in their home, money spent on legal defense of foreclosure and eviction.

184.     Plaintiffs suffered general damages such as loss of property interest, negative impact to their credit rating, and extreme emotional distress as the result of foreclosure and subsequent eviction actions against them.

**Karina Prak v. Bank of America, N. A. &**

**BAC Home Loans Servicing, LP**

185.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

186.     Individual and Representative Plaintiff Karina Prak is a citizen of Massachusetts residing at, and claims to be the rightful owner of 44 Harvard Street, Lowell, MA 01851 which is one of the subject properties referenced herein

187.     On or about November 21, 2007, Plaintiff purchased said subject property for Two Hundred Forty Five Thousand and 00/100 Dollars ($245,000.00) with Twenty Four Thousand Five Hundred and 00/100 Dollars ($24,500.00) of her own funds as down payment and was given a mortgage loan of Two Hundred Twenty Thousand Five Hundred and 00/100 ($220,500.00) by Bank of America, N.A., for the balance of funds required to complete said purchase.

188.     The Deed granting the property to Plaintiff was recorded on November 27, 2007 in the Middlesex County North Registry of Deeds in Book 21768, at page 76. The Mortgage was recorded on November 27, 2007 in the Middlesex County North Registry of Deeds in Book 21768, at page 79.

189.     A short time after executing said Note and Deed of Trust, Countrywide Home Loans obtained the servicing rights to Plaintiff's mortgage loan and subsequently was serviced by Servicer Defendant BAC Home Loans Servicing, LP, as successor in interest to Countrywide.

190.     On or about July 2009, Plaintiff experienced financial hardship which caused her to be unable to make her mortgage payments.

191.     On or about July, 2010, Plaintiff received an offer of modification assistance, via mail, from BAC Home Loans Servicing, LP (BAC), servicer of Plaintiff's mortgage. Said offer represented that BAC was offering the federal government's HAMP, encouraged Plaintiff to apply for modification assistance, and that BAC would assist Plaintiff. Plaintiff also visited Bank of America's website, which further offered modification assistance and represented that they would in good faith help Plaintiff, and further encouraged Plaintiff to apply for modification.

192.     On November 26, 2010, Plaintiff received another letter from BAC thanking her for "her recent call to discuss her home loan needs." Said letter also stated that BAC would review [Plaintiff's] current financial situation to determine if [BAC] can help [Plaintiff] modify [her] mortgage."

193.     Additionally the aforementioned letter also stated that [BAC] "want[ed] to help [Plaintiff]."

194.     Plaintiff relied on these good faith representations and made an application to the Defendant BAC Home Loans Servicing, LP, for consideration for their mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to their hardship on or about January 26, 2011.

195.     Plaintiff then received a modification application package from BAC on or about February 10, 2011, via Federal Express, requesting that the documents inside said package (the identical documents Plaintiff had sent with her January 26, 2011 modification review

request) be filled out and returned by Plaintiff, along with personal financial information, tax information, and a statement attesting to her hardship.

196.     Plaintiff complied with this additional request and did return said modification application package, with the documents requested, to BAC on or about March 3, 2011.

197.     Plaintiff spoke with BAC customer service representatives several times throughout the months of April and May and was told each time that there was additional documentation required in order to determine her eligibility for modification. Each time she was told to provide missing documentation, Plaintiff provided it in a prompt and timely manner by faxing the requested documents directly to the fax numbers she was provided by said BAC customer service representatives.

198.     In May 2011, Plaintiff received a letter from BAC, dated May 13, 2011, claiming that Plaintiff's modification request was not eligible for HAMP, but that she may be eligible for a modification offered by Federal National Mortgage Association (Fannie Mae or FNMA) (Trustee of the mortgage backed Trust that owns Plaintiff's mortgage and Note). This letter requested the same documentation Plaintiff had now already recently sent twice to BAC when applying for HAMP. Plaintiff again complied with this repetitive request for identical documentation again forwarding the filled out documents attached to said letter and personal financial information, tax information, and a statement attesting to her hardship.

199.     Plaintiff received another letter from BAC, dated May 27, 2011, requesting additional information in order to determine eligibility for said Fannie Mae modification, and that the requested information must be received by BAC not later than June 6, 2011. Plaintiff complied with said request and sent the documents back to BAC in the prepaid overnight mail package, provided by BAC with said letter, on June 3, 2011.

200.     Plaintiff called BAC and spoke to various customer service representatives on June 10, June 14, June 16, June 20, June 29, July 6, July 7 July 29, and August 11, 2011. Each time she spoke to a BAC customer service representative, Plaintiff was told that documents she had already sent were either missing and/or expired and that Plaintiff would have to resubmit the

documents requested. Each time after being told to forward additional documents, Plaintiff complied and did send to BAC the documents they requested in a prompt and timely manner.

201.     Plaintiff received another letter from BAC, dated August 12, 2011, thanking her for her interest in the HAMP program and again requesting additional documentation. Said letter does not mention that Plaintiff was told she was ineligible for HAMP in a letter sent to her on May 13, 2011 or that she was now supposedly being considered for a Fannie Mae modification in the alternative.

202.     In the aforementioned August 12, letter, BAC again asked Plaintiff to forward the filled out documents attached to said letter and personal financial information, tax information, and a statement attesting to her hardship. Plaintiff complied with said request and returned all requested documents again to BAC in the prepaid overnight mail package, provided by BAC with said letter on August 16, 2011.

203.     Plaintiff called BAC and spoke to various customer service representatives on June August 19, September 1, and September 8, 2011. Each time she spoke to a BAC customer service representative, Plaintiff was told that documents she had already sent were either missing and/or expired and that Plaintiff would have to resubmit the documents requested. Each time after being told to forward additional documents, Plaintiff complied and did send to BAC the documents they requested in a prompt and timely manner.

204.     Plaintiff was sent a letter from BAC, dated September 2, 2011, which stated that Plaintiff was again ineligible for HAMP because "[Plaintiff] did not provide [BAC] with the documents [BAC] requested.' BAC also stated in said letter that 'A notice which listed the specific documents needed and the time frame required to provide them was sent to [Plaintiff] more than 30 days ago.' Plaintiff claims she received no such notice.

205.     This pattern of Plaintiff sending modification documents to BAC and then receiving a request, from BAC, to re-submit documentation already provided by Plaintiff, happened over and over again until on or about July 15, 2011, when Plaintiff's mortgage loan was finally approved for a trial period plan under HAMP guidelines, effective date of first

payment due August 1, 2012. Plaintiff has just begun to make payments under said trial period plan and has not yet received a permanent modification.

206.     During the entire one year and three months since Plaintiff first applied for the HAMP program she suffered extreme emotional and mental distress as the customer service agents of BAC, acting on corporate policy approved, condoned and ordered executed by the CEO and senior management executives of the Bank of America Servicer Defendants, did in fact; a) falsely deny receiving documents from Plaintiffs when applying for modification consideration, b) lie to Plaintiffs regarding their eligibility for modification, c) intentionally force Plaintiff to wait months before determining and communicating modification eligibility, d) purposely fail to communicate deadlines, incompleteness of documentation, status of modification requests to Plaintiff, e) purposefully fail to properly review Plaintiff's requests for modification assistance, f) purposefully allow Plaintiff's modification documents to continually expire, requiring resubmission, g) attempt to foreclose Plaintiff's mortgage loan in violation of HAMP guidelines[1], and employ all manner of hindering the modification process by design in order to keep Plaintiff's request for modification assistance in abeyance, all as part of a well organized fraudulent scheme to increase corporate profit through gains from the servicing of defaulted mortgage loans.

207.     The BOA Defendants' fraudulently misled Plaintiff with their offers of good faith modification assistance and instead hindered her legitimate request for modification assistance, so as to maximize servicing income and servicing expenses by keeping her modification request in abeyance.

208.     Plaintiff relied on the BOA Defendants' good faith offers of modification assistance. Rather than assist Plaintiff, the BOA Defendants' purposefully hindered her modification request as aforementioned.

---

[1] Plaintiffs' do not claim a right of private action under HAMP.

209.     Plaintiff accepted and acted on those offers of assistance, by applying for modification of her mortgage loan, and such reliance was reasonable. Plaintiff relied on these offers of assistance that they would actually be assisted with their modification request, and further relied on the BOA Defendants' good faith offers of assistance, to follow HAMP Guidelines when applying for modification of their mortgage loan and such reliance was to Plaintiff's detriment as aforementioned.

210.     Plaintiff was owed a reasonable duty of care, by the BOA Defendants, when they offered modification assistance, to ensure that Plaintiff was not exposed to substantial risk of loss. The BOA Defendants were negligent in that duty and breached said duty by knowingly exposing Plaintiffs to substantial risk of loss.

211.     The BOA Defendants' negligence caused Plaintiff harm which was reasonably foreseeable.

212.     Plaintiff suffered quantifiable damages money spent on legal defense of foreclosure and eviction.

213.     Plaintiff suffered general damages such as negative impact to their credit rating, and extreme emotional distress as the result of foreclosure and subsequent eviction actions against them.

**Vanna Phong v BAC Home Loans Servicing, LP and Bank of America, N.A.**

214.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

215.     Plaintiff, Vanna Phong is a citizen of the State of Massachusetts residing at and claims to be the rightful owner of 95 Varley Street, Fall River, MA 02723, which is the one of the subject properties incorporated and referred to herein.

216.     Plaintiff was granted a mortgage loan to refinance the subject property by Countrywide Home Loans, Inc. and executed a Mortgage and Note on July 5, 2006 in the amount of Two Hundred Forty Six Thousand Two Hundred and 00/100 ($246,200.00). Said Mortgage was recorded on July 20, 2006 in the Bristol County, Fall River Registry of Deeds Office in Book 6355, at Page 147.

217.    On or about December of 2009, Plaintiff began to have difficulty maintaining her mortgage payments on said mortgage loan.

218.    On or about April 2010, Plaintiff received an offer of modification assistance, via mail, from BAC Home Loans Servicing, LP (BAC), servicer of Plaintiff's mortgage. Said offer represented that BAC was offering the federal government's HAMP, encouraged Plaintiff to apply for modification assistance, and that BAC would assist Plaintiff. Plaintiff also visited Bank of America's website, which further offered modification assistance and represented that they would in good faith help Plaintiff, and further encouraged Plaintiff to apply for modification.

219.    Plaintiff made an application to the BAC Servicer Defendant for consideration for her mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to her hardship on or about May 2010.

220.    Plaintiff called BAC and spoke to various customer service representatives each month in June, July August, September, October, November, December of 2010, and January, February, March, April, May, June, July of 2011. Each time she spoke to a BAC customer service representative, Plaintiff was told that documents she had already sent were either missing and/or expired and that Plaintiff would have to resubmit the documents requested. Each time after being told to forward additional documents, Plaintiff complied and did send to BAC the documents they requested in a prompt and timely manner.

221.    Making this Plaintiff's case particularly egregious is the fact that her Mortgage is owned by a FNMA Mortgage Backed Trust. As FNMA is one of the administrators of the HAMP Program on behalf of the U.S. Government and most if not all homeowners that meet HAMP Qualifications should easily be able to obtain a HAMP Modification as FNMA does not restrict or prohibit modifications of Mortgages owned by the Trusts it acts as Trustee for,

under HAMP. It is this Plaintiff's claim that she was qualified for a HAMP Modification and that her denial of such by the BAC Home Loans Servicing, LP and Bank of America , N.A. Servicer Defendants was wrongful.

222.    On or about July 29, 2010, BAC Home Loans Servicing, LP sent Plaintiff a Notice of Intention to Foreclose said aforementioned Mortgage, through its attorney Harmon Law, P.C.

223.    On or about September 7, 2011, BAC Home Loans Servicing, LP, held an auction to foreclose Plaintiff's Mortgage secured by said subject property. Said property was purchased by FNMA, upon information and belief, acting as Trustee for said as yet accurately identified FNMA established Mortgage Backed Trust, which, upon information and belief was the lawful Holder of Plaintiff's Mortgage and Note at the time of said auction.

224.    During the entire one year and four months since Plaintiff first applied for the HAMP program she suffered extreme emotional and mental distress as the customer service agents of BAC, acting on corporate policy approved, condoned and ordered executed by the CEOs and senior management executives of the Bank of America Servicer Defendants, did in fact; a) falsely deny receiving documents from Plaintiff when applying for modification consideration, b) lie to Plaintiff regarding her eligibility for modification, c) intentionally force Plaintiff to wait months before determining and communicating modification eligibility, d) purposely fail to communicate deadlines, incompleteness of documentation, status of modification requests to Plaintiff, e) purposefully fail to properly review Plaintiff's requests for modification assistance, f) purposefully allow Plaintiff's modification documents to continually expire, requiring resubmission, and employ all manner of hindering the modification process by design in order to keep Plaintiff's request for modification assistance in abeyance, all as part of a well organized fraudulent scheme to increase corporate profit through gains from the  servicing of defaulted mortgage loans.

225.    On or about July 29, 2010, BAC Home Loans Servicing, LP sent Plaintiff a Notice of Intention to Foreclose said aforementioned Mortgage, through its attorney Harmon Law, P.C.

226.     On or about September 7, 2011, BAC Home Loans Servicing, LP, held an auction to foreclose Plaintiff's Mortgage secured by said subject property. Said property was purchased by FNMA, upon information and belief, acting as Trustee for said as yet accurately identified FNMA established Mortgage Backed Trust.

227.     The BOA Defendants' fraudulently misled Plaintiff with their offers of good faith modification assistance and instead hindered their legitimate request for modification assistance, so as to maximize servicing income and servicing expenses by keeping her modification request in abeyance.

228.     Plaintiff relied on the BOA Defendants' good faith offers of modification assistance. Rather than assist Plaintiff, the BOA Defendants' purposefully hindered her modification request as aforementioned.

229.     Plaintiff accepted and acted on those offers of assistance, by applying for modification of her mortgage loan, and such reliance was reasonable. Plaintiff relied on these offers of assistance that she would actually be assisted with her modification request, and further relied on the BOA Defendants' good faith offers of assistance, to follow HAMP Guidelines when applying for modification of her mortgage loan and such reliance was to Plaintiff's detriment as aforementioned.

230.     Plaintiff was owed a reasonable duty of care, by the BOA Defendants, when they offered modification assistance, to ensure that Plaintiff was not exposed to substantial risk of loss. The BOA Defendants were negligent in that duty and breached said duty by knowingly exposing Plaintiff to substantial risk of loss.

231.     The BOA Defendants' negligence caused Plaintiff harm which was reasonably foreseeable.

232.     Plaintiff suffered quantifiable damages such as loss of equity in her home, money spent on legal defense of foreclosure and eviction.

233.    Plaintiff suffered general damages such as loss of property interest, negative impact to her credit rating, and extreme emotional distress as the result of foreclosure and subsequent eviction action against her.

###    C.    CLASS ALLEGATIONS AS TO SERVICER DEFENDANTS

234.    Plaintiffs' repeat and re-allege every allegation above as if set forth herein in full.

235.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

236.    The Plaintiffs sue on behalf of themselves and all homeowners whose loans have been serviced by the BOA Defendants, and who, since March 5, 2009, have requested consideration and/or applied with the BOA Defendants for a mortgage loan modification and whereby the BOA Defendants fraudulently represented, through offers of assistance, that they would in good faith review those requests, but whereby the CEOs and senior management teams of the BOA Defendants did instead approve, condone, or allow to be executed, fraudulent corporate policies that allowed for their companies agents to; a) falsely deny receiving documents from Plaintiffs and others when applying for modification consideration, b) lie to Plaintiffs and others regarding their eligibility for modification, c) intentionally force Plaintiffs and others to wait months or years before determining and communicating modification eligibility, d) purposely fail to communicate deadlines, incompleteness of documentation, status of modification requests and risk of eligibility loss to Plaintiffs and others, e) purposefully fail to properly review Plaintiffs' and others requests for modification assistance, f) falsely deny eligibility when eligibility should have been granted, g) and purposefully allow Plaintiffs' and others modification documents to continually expire, requiring resubmission, h) and employ all manner of hindering the modification process by design in order to keep applicants in abeyance, in a deliberate effort to keep their mortgage loans in a near perpetual state of default, all as part of a well organized fraudulent scheme to increase corporate profit through gains from the  servicing of defaulted mortgage loans.

237.     Plaintiffs and others relied on the BOA Defendants' good faith offers of modification assistance.

238.     The BOA Defendants' fraudulently misled Plaintiffs and others with their offers of good faith modification assistance and did instead hinder Plaintiffs' and others legitimate requests for modification assistance, so as to maximize servicing income and servicing expenses by keeping those modification requests in abeyance.

239.     Plaintiffs and others relied on the BOA Defendants' good faith offers of modification assistance. Rather than assist Plaintiffs and others, the BOA Defendants purposefully hindered those modification requests as aforementioned.

240.     Plaintiffs and others accepted and acted on those offers of assistance, by applying for modification of their mortgage loans, and such reliance was reasonable. Plaintiffs and others relied on those offers of assistance that they would actually be assisted with their modification requests, and further relied on the BOA Defendants' good faith offers of assistance, to follow HAMP Guidelines (and for general modification reviews, in accordance to good servicing practices) when applying for modification of their mortgage loans and such reliance was to Plaintiffs' and others detriment as aforementioned.

241.     Plaintiffs and other borrowers were owed a reasonable duty of care, by the BOA Defendants, when they offered modification assistance, to ensure that Plaintiffs and others were not exposed to substantial risk of loss. The BOA Defendants' were negligent in that duty and breached said duty by knowingly exposing Plaintiffs and others to substantial risk of loss.

242.     The BOA Defendants' negligence caused Plaintiffs and others harm which was reasonably foreseeable.

243.     The BOA Defendants' conduct was "unfair" in that they invited and encouraged Plaintiffs and others to apply for modifications of their mortgage loans, and through the BOA Defendants' offers of assistance, thought that their applications for modification would be reviewed in good faith.

244.     Instead, the BOA Defendants have, in bad faith, engaged in all of the acts and omissions described herein.

245.     The BOA Defendants' actions and practices offend public policy, and are unethical, oppressive, unscrupulous, or substantially injurious to consumers.

246.     The gravity of harm to Plaintiffs and others resulting from such unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of the BOA Defendants for engaging in such deceptive acts and practices.

247.     The BOA Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business.

248.     Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving and relocation expenses.

249.     Plaintiffs and others have suffered general damages such as loss of property interest, negative impact to credit ratings, loss of their homes, and extreme emotional distress.

250.     Plaintiffs seek punitive damages on behalf of themselves and others so similarly situated.

251.     Plaintiffs claim on behalf of themselves and others so similarly situated that the BOA Defendants' actions, as stated herein above, were the direct cause of the reasonably foreseeable harm they suffered. Plaintiffs and others relied on the BOA Defendants' offers of modification assistance, and agreement with the United States Government to adhere to HAMP guidelines and directives in good faith. Plaintiffs and others accepted and acted on these offers of assistance, by applying for modification of their mortgage loans, and further relied on representations that their mortgage servicer would assist them, in good faith, by following HAMP Guidelines (and in the case of general modification applications, in accordance to good servicing practices) when applying for modification of their mortgage

loans, such reliance was to their detriment, and that it is fair, just and reasonable to impose liability upon the Servicer Defendants as named herein.

252.    Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, the Defendants' current employees and current or former officers, directors, agents, representatives, their family members, the members of this Court and its staff.

253.    Plaintiffs do not know the exact size or identities of members of the Class, since such information is in the exclusive control of Defendants.  Plaintiffs believe that the Class encompasses tens or hundreds of thousands of individuals whose identities can be readily ascertained from Defendants' books and records.  Therefore, the Class is so numerous that joinder of all members is impracticable.

254.    All members of the Class have been subject to and affected by the same conduct. The claims are based on standard form contracts and uniform loan modification processing requirements.  There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the class.  These questions include, but are not limited to the following:

    a.    the nature and scope of the BOA Defendants' fraudulent deceptions regarding their intentions to properly review Plaintiffs' and others modification requests in good faith;

    b.    the nature and scope of the BOA Defendants' fraudulent deceptions of Plaintiffs and others regarding their eligibility to obtain a modification;

    c.    the nature and scope of the BOA Defendants' fraudulent deceptions of Plaintiffs and others regarding intentionally forcing Plaintiffs and others to wait months or years before determining and communicating modification eligibility;

d.     the nature and scope of the BOA Defendants' fraudulent deceptions of Plaintiffs and others regarding purposely failing to communicate deadlines, incompleteness of documentation, status of modification requests and risk of eligibility loss to Plaintiffs and others;

e.     the nature and scope of the BOA Defendants' fraudulent deceptions of Plaintiffs and others regarding purposefully allowing Plaintiffs' and others modification documents to continually expire, requiring resubmission;

f.     the nature and scope of the BOA Defendants' fraudulent deceptions of Plaintiffs and others regarding falsely denying eligibility when eligibility should have been granted;

g.     the nature and scope of the BOA Defendants' fraudulent deceptions of Plaintiffs and others regarding employing all manner of hindering the modification process by design in order to keep applicants in abeyance, in a deliberate effort to keep their mortgage loans in a near perpetual state of default, all as part of a well organized fraudulent scheme to increase corporate profit through gains from the  servicing of defaulted mortgage loans

h.      whether all BOA Defendants' conduct in the circumstances described herein and in the underlying complaints amounts to fraud;

i.     whether all BOA Defendants' conduct in the circumstances described herein and in the underlying complaints amounts to unfair, deceptive and misleading business practices;

j.     whether all BOA Defendants' conduct in the circumstances described herein and in the underlying complaints violates state consumer protection laws;

   k.  whether all BOA Defendants' conduct in the circumstances described herein and in the underlying complaints violates state unfair competition laws;

   l.  whether all BOA Defendants' conduct in the circumstances described herein and in the underlying complaints violates the Rosenthal Act:

   m.  whether the BOA Defendants' conduct was negligent;

   n.  whether the Court can order damages and enter injunctive relief.

255.  The claims of the Named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the class in that the Named Plaintiffs and the other members of the class were subject to the same conduct.

256.  The named Plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the class claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

257.  A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

258.  This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

259.  The BOA Defendants acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

  **D.**  **CAUSES OF ACTION**

**COUNT II**
**As to the BOA Servicer Defendants**
**Fraud**

260.  Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

261.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

262.     The BOA Defendants fraudulently misled Plaintiffs and others with their offers of good faith modification assistance and did instead hinder Plaintiffs' and others legitimate requests for modification assistance, so as to maximize servicing income and servicing expenses by fraudulently and purposefully keeping those modification requests in abeyance.

263.     Plaintiffs and others relied on the BOA Defendants' good faith offers of modification assistance. Rather than assist Plaintiffs and others, the BOA Defendants purposefully hindered those modification requests as aforementioned.

264.     Plaintiffs and others accepted and acted on those offers of assistance, by applying for modification of their mortgage loans, and such reliance was reasonable. Plaintiffs and others relied on those offers of assistance that they would actually be assisted with their modification requests, and further relied on the BOA Defendants' good faith offers of assistance, to follow HAMP[2] Guidelines (and for general modification reviews, in accordance to good servicing practices) when applying for modification of their mortgage loans and such reliance was to Plaintiffs' and others detriment as aforementioned.

265.     The BOA Defendants' fraudulently represented, through their offers of assistance, that they would in good faith review those requests but the CEOs and senior management teams of the BOA Defendants' did instead approve, condone, or allow to be executed, fraudulent corporate policies that allowed for their companies agents to; a) falsely deny receiving documents from Plaintiffs and others when applying for modification consideration, b) lie to Plaintiffs and others regarding their eligibility for modification, c) intentionally force Plaintiffs and others to wait months or years before determining and communicating modification eligibility, d) purposely fail to communicate deadlines, incompleteness of documentation, status of modification requests and risk of eligibility loss to Plaintiffs and

---

[2] Plaintiffs do not seek to state a claim asserting a private right of action under HAMP.

others, e) purposefully fail to properly review Plaintiffs' and others requests for modification assistance, f) falsely deny eligibility when eligibility should have been granted, g) and purposefully allow Plaintiffs' and others modification documents to continually expire, requiring resubmission, h) and employ all manner of hindering the modification process by design in order to keep applicants in abeyance, in a deliberate effort to keep their mortgage loans in a near perpetual state of default, all as part of a well organized fraudulent scheme to increase corporate profit through gains from the  servicing of defaulted mortgage loans.

266.     The BOA Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business.

267.     The BOA Defendants' conduct violated existing statutes, rules, regulations or laws meant for the protection of the public's health, safety or welfare.

268.     Plaintiffs and others are unsophisticated customers and could not have discovered the true nature of the material facts on their own.

269.     Plaintiffs and others were ignorant of the facts, which the BOA Defendants' failed to disclose, and their reliance on the BOA Defendants' offers of assistance was a substantial factor in causing them harm.

270.     As a proximate result of the facts the BOA Defendants' failed to disclose, and Plaintiffs' and others reliance therein, Plaintiffs and others have suffered damages in an amount to be determined at trail.

271.     The conduct of the BOA Defendants as mentioned above was fraudulent, and by virtue thereof Plaintiffs and others are entitled to an award of punitive damages in an amount sufficient to punish and make an example of the BOA Defendants.

272.      Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving and relocation expenses.

273.     Plaintiffs and others have suffered general damages such as loss of property interest, negative impact to credit ratings, loss of their homes, and extreme emotional distress.

274.     Plaintiffs are entitled to punitive damages on behalf of themselves and others so similarly situated.

275.     Plaintiffs and others are entitled to an injunction requiring that the Servicer Defendants take all necessary steps to properly review their modification requests for consideration.

276.     Plaintiffs and others are entitled to an injunction requiring that the Servicer Defendants be prevented from foreclosure action against Plaintiffs and others, or any eviction action until such time as proper reviews of their requests for modification consideration are complete.

277.     The Plaintiffs and others are entitled to cancellation of costs and fees assessed to their accounts for wrongful foreclosure, together with additional damages.

278.     Plaintiffs and others have suffered harm and are threatened with additional harm from the BOA Defendants' fraudulent, deceptive and unlawful practices, including the wrongful loss of a property interest for those who have suffered foreclosure.

279.     The BOA Defendants' conduct was likely to induce reliance and to create confusion and misunderstanding.

280.     The Servicer Defendants' conduct as set forth herein is not required, permitted or authorized by any state or federal law.

281.     The BOA Defendants' conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

282.     Plaintiffs and others are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

## COUNT III
### As to the BOA Servicer Defendants
### Negligence

283.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

284.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

285.    Plaintiffs and others relied on the BOA Defendants' good faith offers of modification assistance.

286.    The BOA Defendants' fraudulently misled Plaintiffs and others with their offers of good faith modification assistance and did instead hinder Plaintiffs' and others legitimate requests for modification assistance, so as to maximize servicing income and servicing expenses by purposefully and knowingly keeping those modification requests in abeyance.

287.    Plaintiffs and others relied on the BOA Defendants' good faith offers of modification assistance. Rather than assist Plaintiffs and others, the BOA Defendants' purposefully hindered those modification requests as aforementioned herein.

288.    Plaintiffs and others accepted and acted on those offers of assistance, by applying for modification of their mortgage loans, and such reliance was reasonable. Plaintiffs and others relied on those offers of assistance that they would actually be assisted with their modification requests, and further relied on the BOA Defendants' good faith offers of assistance, to follow HAMP Guidelines (and for general modification reviews, in accordance to good servicing practices) when applying for modification of their mortgage loans and such reliance was to Plaintiffs' and others detriment as aforementioned herein.

289.    Instead of assisting Plaintiffs and others, the CEOs and senior management teams of the BOA Defendants' did condone, approve and cause to be executed corporate policies that allowed their agents to: a) falsely deny receiving documents from Plaintiffs and others when applying for modification consideration, b) lie to Plaintiffs and others regarding their eligibility for modification, c) intentionally force Plaintiffs and others to wait months or years before determining and communicating modification eligibility, d) purposely fail to

communicate deadlines, incompleteness of documentation, status of modification requests and risk of eligibility loss to Plaintiffs and others, e) purposefully fail to properly review Plaintiffs' and others requests for modification assistance, f) falsely deny eligibility when eligibility should have been granted, g) and purposefully allow Plaintiffs' and others modification documents to continually expire, requiring resubmission, h) and employ all manner of hindering the modification process by design in order to keep applicants in abeyance, in a deliberate effort to keep their mortgage loans in a near perpetual state of default, all as part of a well organized fraudulent scheme to increase corporate profit through gains from the  servicing of defaulted mortgage loans.

290.     Plaintiffs and other borrowers were owed a reasonable duty of care, by the BOA Defendants, when they offered modification assistance, to ensure that Plaintiffs and others were not exposed to substantial risk of loss. The BOA Defendants were negligent in that duty and breached said duty by knowingly exposing Plaintiffs and others to substantial risk of loss.

291.     The BOA Defendants negligence caused Plaintiffs and others harm which was reasonably foreseeable.

292.     As a direct and proximate result of the BOA Defendants negligence, Plaintiffs and others have been injured.

293.     Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving and relocation expenses.

294.     Plaintiffs and others have suffered general damages such as loss of property interest, negative impact to credit ratings, loss of their homes, and extreme emotional distress.

295.     Plaintiffs are entitled to punitive damages on behalf of themselves and others so similarly situated.

296.     The BOA Defendants conduct was likely to induce reliance and to create confusion and misunderstanding.

297.     The BOA Defendants' conduct as set forth herein is not required, permitted or authorized by any state or federal law.

## VI.  <u>TRUSTEE DEFENDANTS</u>

### A.     FACTS

#### i.)  General Background

298.     The Trustee Defendants negligently foreclosed (or attempted foreclosure), directly, or through the BOA Defendants acting as nominee, on Plaintiffs' and others property, knowing that no default to the Holder of Plaintiffs' and others Notes actually existed, in violation of Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602 and §3-603.

299.     As aforementioned, in typical mortgage securitizations, mortgages are added together with other mortgages and a pool of mortgages is created. The resultant pool of mortgages is then sold to a Trust and/or REMIC which becomes the actual owner/holder of the Note and/or Mortgage.

300.     As such, the Note-holder cannot enforce the default provisions of said Note unless a default to said Note-holder exists. The Servicer Defendants and any other subsequent servicing entity of the loans in said Trusts are required to forward, from their own funds, monthly payments of principal and interest not received by the Servicer Defendants, to said Trusts. This is a standard contractual obligation of servicers, and practice in residential mortgage securitizations.

301.     Additionally, the named Plaintiffs and others gave Promissory Notes in return for being granted their mortgage loans. Those Notes are contracts between the borrower and the Holder of those Notes (Trusts). In Section 8 of all standard mortgage related Notes it is stated;

> **Obligations of Persons under Note**
>
> "…<u>*Any person who takes over these obligations*</u>*, including the obligations of a guarantor, surety or endorser of this Note,* <u>*is also obligated to keep all the promises made in this Note.*</u>" [emphasis added]

When a Servicer makes delinquency advances to a Trust, they are taking over *"the[se]*
*obligations"* contained in the Note, and by doing so they make those delinquency advance
payments on the borrowers' behalf. This statement, contained in all standard mortgage related
promissory notes, makes clear that Servicers' payments of borrowers' delinquent monthly
obligations of principal and interest to the Trusts are on borrowers' behalf.

302.     By fulfilling their obligation to pay delinquency advances, the Servicer Defendants
act as a third party making payment on behalf of defaulted borrowers to the Holders of those
Mortgages and/or Notes (Trusts). As only the true Holders of those Mortgages and Notes is
able to enforce the default provisions of the Notes, defaults to the true Holders of said Notes
must exist in order to enact foreclosure of those mortgages.

303.     The Servicer Defendants are required, as a party with no security interest in the
Plaintiffs' and others properties, Mortgages and/or Notes, to pay the principal and interest
payments of those Plaintiffs' and others who have yet to remit payment (delinquency advance
payments). In making delinquency advance payments, the Servicer Defendants take over the
obligations of the Note given by Plaintiffs and others, and make those payments on Plaintiffs
and others behalf. As such, no default to the Holders of said Notes existed (or exists) in any
situation whereby foreclosure action commenced and/or was completed regarding any
foreclosure whereby Plaintiffs' and others Mortgages and Notes were/are held by any
Securitized Mortgage Backed Trust.

### ii.)     Contractual Obligations among Parties in a Mortgage Securitization

304.     Prospectus', Prospectus Supplements, the Federal Home Loan Mortgage Corporation
(FHLMC) Master Trust Agreement and the Federal National Mortgage Association (FNMA)
Master Trust Agreement, which are entered as Exhibits in support of Plaintiffs' claims herein,
are not contracts with mortgage servicers.

305.     In fact, the Prospectus' and Prospectus Supplements are not contracts at all. The
Prospectus' and/or Prospectus Supplements are documents given to potential purchasers of the
Mortgage Backed Securities (MBSs), bonds, and/or certificates being offered for sale by

Trusts in much the same manner that a company going public issues a prospectus prior to the issuance of its stock on a public exchange; they are not contracts or agreements with servicers.

306.     Likewise, FHLMC, and FNMA Master Trust Agreements are also not "contracts" with anyone other than FNMA and itself, and FHLMC and itself, acting in their separate capacities as Issuer, Master Servicer, Guarantor, and Trustee.

307.     These Prospectus' and Prospectus Supplements and FNMA Master Trust Agreement have been submitted as Exhibits herein as support for the factual basis of Plaintiffs' claim, that monthly payments are made by Servicers (advances), to Trusts, of principal and interest due, but not received by Servicers, regarding the mortgage loans of Plaintiff borrowers.

308.     There exist two separate and distinct sets of contractual obligations in Prospectus' and Prospectus Supplements and the FNMA Master Trust Agreement, which are joined together in statements therein by their drafters; 1) a contract between the mortgage loan servicer and the Trust; and 2) a contract between the Trust and its bond-holders/certificate holders.

309.     In the example of a private label securitization, the actual contract that defines the rights of Trusts and the contractual obligations of mortgage servicers to Trusts is called a Pooling and Servicing Agreement (PSA).

310.     In the example of a FNMA or FHLMC established mortgage backed Trust the corresponding contract is called a Direct Servicing Contract. These actual contracts are exclusively between the servicers and the Trusts, not servicers and bond-holders.

311.     The second contract at issue is the bonds or certificates. These actual contracts are exclusively between the Trust and its bond-holders and/or certificate holders, not bond-holders and servicers. They define the rights of the bond-holders and the contractual obligations of the Trusts to them.

312.     In Prospectus', Prospectus Supplements, and the FNMA Master Trust Agreement, the drafters of those documents merged the separate and distinct contractual obligations and

rights of servicers, Trusts, and bond-holders, joining them together in clauses, including, but not limited to, clauses regarding delinquency advances.

313.     When a servicer pays a delinquency advance to a Trust, said servicer is fulfilling their contractual obligation with the Trust to do so. Plainly stated, the servicer has a contract with the Trust to make delinquency advances. The servicer does not have a contract with or contractual obligation to the bond-holders of that Trust. The contract between the servicer and the Trust is identified as either; a Pooling and Servicing agreement, or a FNMA Direct Servicing Contract, and bond-holders are not a party to either.

314.     The monthly payments paid to bond-holders are defined in a separate contract between the Trust and its bond-holders. This contract is called the bond or certificate. It is solely between the Trust and its bond-holders or certificate holders, and the servicer is not a party to it.

315.     The Servicer has a contract directly with the Trust (pooling and servicing agreement, Trust Agreement). The Servicer's obligations under that contract are solely to the Trust, not the bond-holders of the Trust, and the obligations of the Trust to its bond-holders are a separate contract (Bonds/Certificates). This is illustrated in Fig. 1 below;

**Fig. 1**
Contracts of parties to a mortgage securitization that are relevant to this Action



316.     As aforementioned, the Trusts themselves have a separate contractual obligation to pay each bond-holders their *pro rata* share of the monthly payments due on the Notes held by the Trusts, each month, according to the terms of the certificates or bonds they hold. The Notes must be considered by these parties to be paid in order for the Trust to make distributions to those bond-holders or payments due on the Notes could not possibly be distributed among bond-holders.

317.     Trusts accept these payments as payments of the Notes, thus enabling them to make bond-holder distributions, and bond-holders accept these distributions as payments of the scheduled monthly payments of principal and interest due on Notes each month.

318.     As such the Plaintiff's and others mortgage payments (paid as delinquency advances by Servicers who had taken over Plaintiffs' and others obligations pursuant to their Notes) were in fact received by the actual Note-holders (Trusts and eventually bond-holders) and no enforceable defaults existed at time of foreclosures.

319.     Records regarding the advances made to Trusts regarding Plaintiff's and others Mortgages are held by the Servicer Defendants and the Trustee Defendants, the information regarding the these Defendants' custodial accounts as they relate to said Trusts can be easily obtained through discovery.

320.     Moreover, it is clear that if the representations regarding delinquency advances, published in the Prospectus', Prospectus Supplements referenced herein were adhered to, the Servicer Defendants, as third party, did in fact take over (pursuant to the Note) and pay the obligations of Plaintiffs' and others so situated, to the Holders of Plaintiffs' and others Deeds of Trust and/or Notes and, as such, the Trustee Defendants and Servicer Defendants were aware that no default of said Notes existed to the Holders of Plaintiffs and others Mortgages and/or Notes at the time foreclosure action was negligently commenced and/or completed, subsequently rendering those foreclosures void.

**iii.)     Federal National Mortgage Association - Facts**

321.     In cases whereby Defendant FNMA claims to be the purported Holder of a

Plaintiff's Deed of Trust and Note it is important to be familiar with said Defendant's business

mechanism.

322.     FNMA buys mortgage loans (I.e. Deeds f Trusts and Notes) from approved

mortgage sellers, FNMA securitizes these mortgage loans (creates and establishes Trusts that

become the true Holder of the Deeds of Trust and Notes in the same fashion as the

aforementioned private label mortgage backed Trusts), appoints itself as Trustee of the Trusts

it creates which then sells the resultant mortgage-backed securities to investors, with FNMA's

unconditional  guarantee that all of the stated principal and interest payments of the mortgage

loans held by said Trust will be timely passed through to the Trust and ultimately the

investors. Stated on page one of the Amended and Restated 2007 FNMA Single Family Trust

Agreement dated January 1, 2009 is as follows;

> C.     Fannie Mae has purchased and intends to purchase residential
> mortgage loans.
>
> D.     Fannie Mae intends to set aside and transfer residential loans
> acquired by it to various Trusts established pursuant to this Trust
> Agreement and the related Issue Supplements and to issue
> guaranteed mortgage pass through certificates representing
> undivided beneficial ownership interest in the assets of the related
> Trusts.
>
> E.     Fannie Mae intends to guarantee to each Trust sufficient funds to
> permit timely distribution s to Holders of principal and interest on
> Certificates, a required by this Trust Agreement.
>
> F.     Fannie Mae intends to be the Master Servicer of the Mortgage
> Loans held in each Trust and to arrange for and supervise the
> contractual servicing of the Mortgage Loans by Direct Servicers.
>
> G.     Fannie Mae intends to be the Trustee for each Trust.

323.     FNMA creates Trusts, exactly like a private label securitization of mortgages, and

remains as Trustee (and Master Servicer) of each Trust. The Trusts now become the true

Holders of Notes and Mortgages of each securitization, not FNMA. As stated in the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement the Direct Servicer (i.e. the Servicer Defendants) may be responsible for *"Delinquency Advances"* as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans, just as in Prospectus', Prospectus Supplements, and PSAs governing private label securitizations. However, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not or is not required to forward said Delinquency Advances, FNMA unconditionally guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust Agreement.

324.     As Defendant FNMA is a major purchaser of mortgage loans and seller of mortgage backed securities but is not required to register it's Trusts and/or governing Direct Servicer Agreement's with the U.S. Securities and Exchange Commission. However, the records regarding the identities of said FNMA Trusts and the monthly payment advances regarding the Plaintiffs' and others mortgages purportedly owned, guaranteed or held by FNMA Trusts (or "FNMA Pools" as they are often referred to) are in the sole possession of Defendant FNMA and can readily be obtained through discovery.

325.     Furthermore, FNMA, acting in its capacity as Trustee of the Trusts it created, was not the owner of Plaintiffs' and others Deeds of Trust and Notes prior to foreclosure auctions and/or recording of Assignments of Deeds of Trust. FNMA merely claims ownership after purchasing said properties at auction, acting in its capacity as Trustee, on behalf of said Trusts.

326.     Moreover, FNMA established Trusts were the actual Holders of Plaintiffs' and millions of others Deeds of Trust and Notes at the time foreclosure action was initiated and concluded against them in the name of FNMA (or by Servicer Defendants acting on FNMA's behalf and/or on its instruction, which is more often the case) as the claimed Holder.

327.     Defendant FNMA, acting in its capacity as Master Servicer, forwarded to the Trusts that are/were the Holders of Plaintiffs' and others Deeds of Trust and Notes, the monthly scheduled payments of principal and interest due, as is required by FNMA's unconditional guarantee, as a third party, on behalf of Plaintiffs' and others, regardless of whether they were received by the Direct Servicer (the Servicer Defendants) or FNMA as Master Servicer. As such, the Notes of Plaintiffs' and others were not in default to the Holders of same (FNMA Trusts) at the time of foreclosure action.

328.     Trustee Defendant FNMA knew that they (or the Servicer), as third party, had in fact taken over (pursuant to the Note) and paid the obligations of the Plaintiffs' and others so situated, to the Holders of Plaintiffs' and others Deeds of Trust and/or Notes and, as such, was aware that no default of said Notes existed to the Holders of Plaintiffs and others Mortgages and/or Notes at the time foreclosure action was negligently commenced and/or completed.

### iv.  Federal Home Loan Mortgage Corporation - Facts

329.     In cases whereby Defendant FHLMC claims to be the purported owner of a Plaintiff's Deed of Trust and Note it is important to note that said Defendant's business mechanism is almost identical to that of Defendant FNMA.

330.     FHLMC buys mortgage loans (i.e. Deeds of Trusts and Notes) from approved mortgage sellers, FHLMC securitizes mortgages loans (creates and establishes Trusts that become the true owner of the Deeds of Trust and Notes in the same fashion as FNMA), appoints itself as Trustee of the Trusts it creates which then sells the resultant mortgage-backed securities to investors, with FHLMC's unconditional  guarantee that all of the stated principal and interest payments of the mortgage loans held by said Trust will be timely passed through to the Trust and ultimately the investors. Stated on page one, section (b) of the FHLMC Pass-Through Certificates Master Trust Agreement  is as follows;

> "(b) Freddie Mac may from time to time (i) retain, reacquire or purchase
> mortgage-related securities and other mortgage-related assets that are
> referred to herein as "assets" in accordance with the applicable provisions

of the Freddie Mac act, (ii) as depositor, transfer and deposit such assets into various trust funds that are established pursuant to this agreement and that are referred to herein as "pass-through pools," (iii) as trustee, create and issue hereunder, on behalf of the related pass-through pool, mortgage-related securities representing all the beneficial interests in the assets of the related pass-through pool and otherwise act as trustee for each such pass-through pool, (iv) as guarantor, guarantee the payment of interest and principal for the benefit of the holders of such mortgage-related securities and (v) as administrator, administer the affairs of each such pass-through pool."

331.    FHLMC creates Trusts, exactly like a private label securitization of mortgages (and FNMA), and remains as Trustee (and Master Servicer or "Administrator") of each Trust. The Trusts now become the true Holders of Notes and Deeds of Trust (i.e. the "Assets" of a FHLMC "Pass-Through Pool" as they are commonly referred, respectively) of each securitization, not FHLMC. As stated in the FHLMC Pass-Through Certificates Master Trust Agreement an asset of a FHLMC created Trust ("Pass-Through Pool") is defined as an asset transferred by the Depositor (FHLMC) to the Trustee (FHLMC) for inclusion in a Pass-Through Pool and backing the related Pass-Through Certificates (MBS).

332.    Furthermore, as stated in the FHLMC Pass-Through Certificates Master Trust Agreement, FHLMC as the Depositor, by delivering any assets pursuant to said Master Trust Agreement, unconditionally, absolutely and irrevocably transfers, assigns, sets over and otherwise conveys to the Trustee (FHLMC) of said Pass-Through Pools (FHLMC created Trusts), on behalf of the related Holders, all of Depositor's (FHLMC) right, title and interest in and to such assets, including all payments of Principal and Interest thereon received.

333.    Moreover, Defendant FHLMC guarantees to each Trust it creates, Trustee of each Trust (FHLMC) and to each Holder of a Pass-Through Certificate, timely payment of principal and interest. This guarantee is irrespective of the cash flows received from borrowers.

334.     As Defendant FHLMC is a major purchaser of mortgage loans and seller of mortgage backed securities but is not required to register it's Trusts with the U.S. Securities and Exchange Commission, the records regarding the identities of said FHLMC Trusts and the monthly payment advances regarding the Plaintiffs'  and others mortgage loans purportedly owned, guaranteed or held by FHLMC Trusts (or "Pools" as they are often referred to) are in the sole possession of Defendant FHLMC and can readily be obtained through discovery.

335.     FHLMC, acting in its capacity as Trustee of the Trusts it created, was not the Holder of Plaintiffs and others Deeds of Trust and/or Notes prior to foreclosure auctions and/or recording of Assignments of Deeds of Trust. FHLMC merely claims ownership after purchasing said properties at auction, acting in its capacity as Trustee, on behalf of said Trusts.

336.     Moreover, the Plaintiffs' so named herein, and millions of other homeowners have had their mortgages foreclosed by FHLMC (or by Servicer Defendants acting on FHLMC's behalf and/or on its instruction) on a scale so enormous it is almost unfathomable.

337.     Furthermore, FHLMC established Trusts were the actual Holders of Plaintiffs' and millions of others Deeds of Trusts and Notes at the time foreclosure action was initiated and concluded against them in the name of FHLMC (or by Servicer Defendants acting on FNMA's behalf and/or on its instruction, which is more often the case) as the claimed Holder.

338.     Moreover, Defendant FHLMC, acting in its capacity as Trustee, took over Plaintiffs' and other obligations (pursuant to their Notes), and forwarded to the Trusts that are/were the Holders of Plaintiffs' and others Deeds of Trust and Notes, the monthly scheduled payments of principal and interest due, as is required by FHLMC's unconditional guarantee, as a third party, on behalf of Plaintiffs' and others, regardless of whether they were received by the Direct Servicer (the Servicer Defendants) or FHLMC as Administrator of each Trust. As such, the Notes of Plaintiffs' and others were not in default to the Holders of same (FHLMC Trusts) at the time of foreclosure action.

339.     Trustee Defendant FHLMC knew that they (or the Servicer), as third party, had in fact taken over (pursuant to the Note) and paid the obligations of the Plaintiffs' and others so situated, to the Holders of Plaintiffs' and others Deeds of Trusts and/or Notes and, as such, was aware that no default of said Notes existed to the Holders of Plaintiffs and others Deeds of Trust and/or Notes at the time foreclosure action was negligently commenced and/or completed.

> **v.  BOA Servicer Defendants' Involvement in Foreclosure Process Completes their Fraud**

340.     Making the BOA Servicer Defendants' conduct even more egregious is the fact that they are the very entities carrying out said illegal foreclosure actions, as nominee for FHLMC, in spite of the fact that they are often also the very entities making the delinquency advance payments to the actual Note-holders.

341.     Typically, mortgage servicers are granted the power to act as nominee for the Trustee (be it FNMA, FHLMC, or the Trustee of a private-label securitized Trust), which gives them the ability to act with complete authority and control over the foreclosure and liquidation process of the mortgages it services for Trusts.

342.     This fact is evidenced in the FNMA Master Trust Agreement, and in Prospectus Supplements of private-label securitized Trusts regarding same.

343.     Foreclosure and eviction actions are carried out, often in the name of the Servicer Defendants, acting as nominee of the Private Label Trusts, FHLMC, and/or FNMA, by the servicer.

344.     This gives the BOA Servicer Defendants' complete control over all foreclosure, eviction and liquidation actions. As such, it is impossible for the BOA Servicer Defendants' to be unaware that their actions regarding foreclosures are both negligent and in violation of State Uniform Commercial Code.

345.     The ability to act as nominee of the Trust in the above described capacity, rounds out the aforementioned fraudulent scheme perpetrated by the BOA Servicer Defendants. The

BOA Servicer Defendants offer assistance and encourage Plaintiff borrowers and others to apply for modification of their mortgage loans. The BOA Defendants then use all manner of fraudulent tactics (as aforementioned herein) designed to hinder the modification process by keeping those Plaintiff borrowers and others defaulted mortgage loans in abeyance.  While those mortgage loans are in default, the BOA Servicer Defendants collect servicing fees based on the principal balances of the mortgage pools they service for Trusts, which have been artificially inflated by keeping Plaintiff borrowers and others defaulted mortgage loans in abeyance through the fraudulent hindrance of their application for modifications. The BOA Servicer Defendants, having complete control over the loss mitigation, foreclosure and liquidation processes, waits to foreclose on the defaulted mortgage loans of Plaintiff borrowers and others, until the amount of advances has reached the point whereby they can recover the maximum amount of money from liquidation proceeds based on the BOA Servicer Defendants' estimates of liquidation price. When the BOA Servicer Defendants feel they have squeezed every dime they can out of a defaulted mortgage loan, they then foreclose, liquidate, and recover their money advanced, their profit from interest on those advances, and their illicit "padding" (as aforementioned) of advanced servicing expenses.

346.    The BOA Servicer Defendants are aware of the payments they have made to the actual Note Holders with respect to advances of delinquent monthly mortgage payments of Plaintiffs and others, to mortgage backed trusts.

347.    As such, the BOA Servicer Defendants are aware that Note-holders receiving payment of delinquent monthly mortgage payments of Plaintiffs and others, in the form of delinquency advances constituted payment of those Notes

348.    The BOA Servicer Defendants' handle all foreclosure, eviction and liquidation of Plaintiffs' and others mortgage loans and property, having the full knowledge that all those actions are in fact preceded by a violation of State Uniform Commercial Code and are simultaneously negligent.

### vi.    Summary

349.    During this entire foreclosure crisis, the Servicer and Trustee Defendants have tried to keep the knowledge of their contractual obligations to each other, and their complex interactions and relationships out of public knowledge, for fear of being found that many of their practices are willfully, knowingly and purposefully designed to flaunt and violate laws as if they were of no consequence, all in a precise, well organized effort to reap billions of dollars in illicit profits for their respective firms while financially, mentally and emotionally damaging the Plaintiffs and others, and severely damaging the economic wellbeing of this Nation as a whole.

350.    The actions of the Servicer and Trustee Defendants, in foreclosing, directly or through the Servicer Defendants as nominee, the mortgage loans of Plaintiffs and others, is in violation of Massachusetts Uniform Commercial Code as those Notes, joined to said mortgage loans, given by Plaintiffs and others, were not in default, due to the BOA Servicer Defendants and/or FNMA, or FHLMC, as Trustee, taking over the obligations of the Plaintiffs and others (pursuant to those Notes) and paying those obligations to the true holders of those Notes.

351.    Plaintiffs and others were harmed by the Servicer and Trustee Defendants' violation of Massachusetts Uniform Commercial Code in that they were foreclosed upon or foreclosure was attempted illegally, suffered the wrongful loss of property, suffered eviction from their homes, their credit ratings were damaged, incurred legal expenses related to bankruptcy, foreclosure and eviction defense, incurred moving and storage expenses, and were the subject of extreme emotional and mental distress.

352.    Plaintiffs and others have standing to make their claims for violation of Massachusetts Uniform Commercial Code in that they are parties to contracts, through those Notes, given in exchange for their mortgage loans, to their lender which were subsequently purchased and held by the various Trusts as noted herein.

353.     The BOA Servicer and Trustee Defendants violated Massachusetts Uniform Commercial Code in that they knowingly took the actions described herein, acting on behalf of those Trusts.

354.     The BOA Servicer and Trustee Defendants were negligent in their duty of care in their actions as stated herein.

355.     The BOA Servicer and Trustee Defendants owed Plaintiffs and others reasonable duties of care as the servicers of their mortgage loans, and as Trustees of the Trusts that owned Plaintiffs and others Notes, to not illegally attempt to foreclose, or complete foreclosure on their mortgage loans and subsequently evict them from their rightful property.

356.     Plaintiffs and others relied on the BOA Servicer and Trustee Defendants' duties of care owed to them and were instead knowingly exposed to substantial risk of loss, by being illegally threatened with foreclosure, foreclosed upon, and evicted from their rightful property.

357.     The BOA Servicer and Trustee Defendants' knowingly illegally foreclosed the mortgage loans of Plaintiffs and others and it was reasonably foreseeable that those actions would be the direct cause of the harm suffered by Plaintiffs and others.

358.     The BOA Servicer and Trustee Defendants' knew they had, taken over Plaintiffs and others monthly mortgage obligations, pursuant to their Notes, and made delinquency advance payments to the Trusts that owned Plaintiffs and others Mortgages.

359.     The BOA Servicer and Trustee Defendants' then foreclosed on Plaintiffs and others , knowing their Notes were not in default, exposing them to significant risk of loss.

360.     Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, loss of property interest, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving, storage and relocation expenses.

361.     Plaintiffs and others have suffered general damages such as negative impact to credit ratings, extreme mental and emotional distress as the result of being threatened with foreclosure, and eventual loss of their homes.

**Morcos H. Hanna & Suzan H. Andraus v FHLMC, BAC Home Loans Servicing, LP**
**& Bank of America, N.A.**

362.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

363.     Plaintiff Morcos H. Hanna & Suzan H. Andraus are citizens of the State of
Massachusetts residing at, and claim to be the rightful owner of 22 A-B Montvale Avenue,
Stoneham, MA 02180, which is the subject property incorporated and referred to herein.

364.     On or about August 6, 2003, Plaintiffs gave a first Mortgage and Note to
Countrywide Home Loans, Inc. in the original principal amount of $300,000.00, and a second
Mortgage and Note to Countrywide, in the original principal amount of $30,000.00, secured
by said subject property. Said mortgages were recorded in the Middlesex South County
Registry of Deeds, on August 7, 2003, in Book 40362, at page 443 and 447, respectively.

365.     On or about September - October 2003, Plaintiffs' Mortgage and Note were sold to
FHLMC, with direct servicing rights given to Countrywide.

366.     On or about October - November 2003 FHLMC pooled and sold Plaintiffs' Note and
Mortgage to an as yet identified FHLMC sponsored mortgage backed Trust (or "FHLMC
Pass-Through Pool" as they are often referred).

367.     Countrywide Home Loans continued to service Plaintiff's mortgage loan which
subsequently became to be serviced by Servicer Defendant BAC Home Loans Servicing, LP,
as successor in interest to Countrywide.

368.     On or about January 2010, Plaintiffs experienced financial hardship which caused
them to be unable to make their mortgage payments.

369.     On July 16, 2010, Harmon Law sent Plaintiffs notice they had been retained by
Defendant BAC Home Loans Servicing, LP to foreclose Plaintiffs' mortgage, while Plaintiffs
were being considered for HAMP eligibility.

370.     On May 3, 2011, Harmon Law sent Plaintiffs a Notice of Mortgage Foreclosure Sale
on behalf of Defendant BAC Home Loans Servicing, LP stating a scheduled auction date of
June 3, 2011.

371.     On June 3, 2011, Defendant BAC Home Loans Servicing, LP purchased the subject property at said mortgage foreclosure auction for Two Hundred Nine Thousand Two Hundred Eleven and 00/100 dollars ($209,211.00).

372.     On June 29, 2011, Defendant BAC Home Loans Servicing, LP assigned their rights, title and interest in their bid at said auction of the subject property, to Federal Home Loan Mortgage Corporation.

373.     As stated in the FHLMC Pass-Through Certificates Master Trust Agreement an asset of a FHLMC created Trust ("Pass-Through Pool") is defined as an asset transferred by the Depositor (FHLMC) to the Trustee (FHLMC) for inclusion in a Pass-Through Pool and backing the related Pass-Through Certificates (MBS).

374.     Furthermore, as stated in the FHLMC Pass-Through Certificates Master Trust Agreement, FHLMC as the Depositor, by delivering any assets pursuant to said Master Trust Agreement, unconditionally, absolutely and irrevocably transfers, assigns, sets over and otherwise conveys to the Trustee (FHLMC) of said Pass-Through Pools (FHLMC created Trusts), on behalf of the related Holders, all of Depositor's (FHLMC) right, title and interest in and to such assets, including all payments of Principal and Interest thereon received.

375.     Defendant FHLMC guarantees to each Trust it creates, Trustee of each Trust (FHLMC) and to each Holder of a Pass-Through Certificate, timely payment of principal and interest. This guarantee is irrespective of the cash flows received from borrowers.

376.     Plaintiffs' allege that the BOA Servicer Defendants (BOA) or FHLMC had in fact taken over their payment obligations, pursuant to Section 8 of the Note Plaintiffs' gave in return for said mortgage loan, and BOA or FHLMC did make all of the payments due thereunder, to the Note Holder, to the true owner of Plaintiffs' Note and Mortgage, an as yet accurately indentified FHLMC mortgage backed Trust, as is stated as being required in the FHLMC Pass-Through Certificates Master Trust Agreement, evidenced herein, regarding said mortgage backed Trust. As such the Note was not in default at the time foreclosure action was commenced and/or completed.

377.     As such, said foreclosure was illegal and void, as no default existed to the Holder of Note and/or Mortgage at time of the aforementioned foreclosure actions

378.     The Plaintiffs' Mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale could not have been legally exercised

379.     Plaintiffs' allege that said foreclosure action was illegal as no default existed to Holder of their Note due to the third party servicer's (BOA) and/or Administrator and/or Trustee FHLMC's payment of their mortgage obligation to the Holder of their Note and Mortgage (the as yet identified FHLMC Trust) as required under the FHLMC Master Trust Agreement regarding said mortgage obligation.

380.     As no default of the Note existed to said, as yet unidentified, FHLMC sponsored mortgage backed Trust, which was the lawful owner of Plaintiffs' Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

381.     The records regarding the direct servicing contract among the parties and principal and interest payments to said FHLMC sponsored mortgage backed Trust, regarding Plaintiffs' mortgage obligation, are in the control of Defendant FHLMC, and this information can readily be obtained through discovery. However, if the terms of FHLMC's Master Trust Agreement were adhered to, it is clear that no default of Plaintiffs' Note existed at time foreclosure action was commenced and/or completed.

382.     The Defendants' violated Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in attempting the foreclosure actions stated herein, as Plaintiff's Note was not in default, due to the Defendants BAC Home Loans Servicing, LP, Bank of America, N.A. and/or FHLMC taking over the obligations of the Plaintiffs (pursuant to their Note) and paying those obligations to the true holder of their Note.

383.     The Defendants' owed Plaintiffs a reasonable duty of care to not attempt or complete foreclosure actions against them that were illegal. Defendants instead knowingly exposed Plaintiffs to substantial risk of loss, by illegally threatening them with foreclosure. As such,

said Defendants breached those reasonable duties of care owed to Plaintiffs. Plaintiffs relied on the Defendants' duty of care and such reliance was reasonable.

384.    The Defendants' negligence caused Plaintiffs harm which was reasonably foreseeable.

385.    The Defendants' illegal foreclosure actions and negligence therein were the direct cause of damages suffered by Plaintiffs.

386.    Plaintiffs suffered loss of property interest, are currently subject to an eviction action and threatened with the loss of their home, loss of equity, significant damage to their credit ratings, significant legal costs in defense of foreclosure and eviction, and severe and extreme emotional and mental distress.

**Vanna Phong  v  Bank of America, N.A., BAC Home Loans Servicing, LP, and FNMA**

387.    Plaintiff repeats and re-allegse every allegation above as if set forth herein in full.

388.    Plaintiff Vanna Phong is a citizen of the State of Massachusetts residing at and claims to be the rightful owner of 95 Varley Street, Fall River, MA 02723, which is one of the subject properties referred to herein.

389.    Plaintiff was granted a mortgage loan to refinance the subject property by Countrywide Home Loans, Inc. and executed a Mortgage and Note on July 5, 2006 in the amount of Two Hundred Forty Six Thousand Two Hundred and 00/100 ($246,200.00). Said Mortgage was recorded on July 20, 2006 in the Bristol County, Fall River Registry of Deeds Office in Book 6355, at Page 147.

390.    On or about September - October 2006, upon information and belief, said mortgage was pooled by Trustee Defendant FNMA, with a large number of other mortgages and sold to an as yet known and unidentified FNMA created Trust, with servicing rights to said Mortgage granted to Countrywide Home Loans, Inc.

391.    Upon information and belief, the servicing of the Mortgage, and the Note given by Plaintiff was, from no later than October 2006, governed by a FNMA Master Trust

Agreement and her mortgage payments were unconditionally guaranteed, by FNMA, to said Trust, as specified in said Trust Agreement.

392.    In 2007, Defendant Bank of America commenced negotiations to acquire Countrywide Home Loans, Inc. and Countrywide Financial Corporation (hereinafter referred to as "Countrywide").  By late 2007, Bank of America, N.A. began merging its operations with Countrywide and adopting some of Countrywide's practices.  From and after its acquisition of Countrywide in July 2008 and continuing to the present, both as a successor in interest to Countrywide and as a principal, Bank of America, N.A., by and through its wholly owned subsidiary BAC Home Loans Servicing, LP, became the servicer of Plaintiff's mortgage loan. On or about December of 2009, Plaintiff began to have difficulty maintaining her mortgage payments on said mortgage loan.

393.    On or about July 29, 2010, BAC Home Loans Servicing, LP (a division of Bank of America, N.A.) sent Plaintiff a Notice of Intention to Foreclose said aforementioned Mortgage, through its attorney Harmon Law, P.C.

394.    On or about September 7, 2011, BAC Home Loans Servicing, LP, held an auction to foreclose Plaintiff's Mortgage secured by said subject property. Said property was purchased by FNMA, upon information and belief, acting as Trustee for said as yet accurately identified FNMA established Mortgage Backed Trust, which was the lawful Holder of Plaintiff's Mortgage and Note at the time of said auction.

395.    Plaintiff alleges that either FNMA or the BOA Servicer Defendants had in fact taken over her payment obligations, pursuant to Section 8 of the Note Plaintiff gave in return for said mortgage loan, and either FNMA or the BOA Servicer Defendants did make all of the payments due thereunder, to the Note Holder, said as yet identified FNMA mortgage backed Trust, and as such the Note was not in default at the time foreclosure action was commenced and/or completed.

396.    As such, said foreclosure was illegal and void as no default existed to the Holder of Note and/or Deed of Trust at time of the aforementioned foreclosure actions.

397.     As stated in the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement the Direct Servicer (i.e. the Servicer Defendant BOA) may be responsible for *"Delinquency Advances"* as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans.

398.     Furthermore, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not or is not required to forward said Delinquency Advances, FNMA unconditionally guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust.

399.     The Plaintiff's Mortgage provides for a Statutory Power of Sale in the event of a default of the Note. However, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale could not have legally be exercised.

400.     As no default of the Note existed to said, as yet unidentified, FNMA sponsored mortgage backed Trust, which was the lawful owner of Plaintiff's Mortgage and Note, the foreclosure and foreclosure proceedings are/were invalid.

401.     The records regarding the direct servicing agreement among the parties and principal and interest payments to the FNMA sponsored mortgage backed Trust, regarding Plaintiff's mortgage, are in the control of Defendant FNMA, and this information can readily be obtained through discovery. However, if the terms of FNMA's Master Trust Agreement were adhered to, it is clear that no default of Plaintiff's Note existed at time foreclosure action was commenced and/or completed.

402.     The Defendants' violated Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in attempting the foreclosure actions stated herein, as Plaintiff's Note was not in default, due to BOA Servicer Defendants and/or FNMA taking over the obligations of the Plaintiff (pursuant to her Note) and paying those obligations to the true holder of her Note.

403.     The Defendants' owed Plaintiff a reasonable duty of care to not attempt or complete foreclosure actions against her that were illegal. Defendants instead knowingly exposed Plaintiff to substantial risk of loss, by illegally threatening her with and completeing foreclosure and subsequent eviction actions. As such, said Defendants breached those reasonable duties of care owed to Plaintiff. Plaintiff relied on the Defendants' duty of care and such reliance was reasonable.

404.     The Defendants' negligence caused Plaintiff harm which was reasonably foreseeable.

405.     The Defendants' illegal foreclosure actions and negligence therein were the direct cause of damages suffered by Plaintiff.

406.    Plaintiff suffered loss of property interest, loss of equity, significant damage to her credit rating, costs associated with legal defense of foreclosure and eviction, and severe and extreme emotional and mental distress.

### C.     CLASS ALLEGATIONS AS TO SERVICER & TRUSTEE DEFENDANTS

407.     Plaintiffs' repeat and re-allege every allegation above as if set forth herein in full.

408.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

409.     The named Plaintiffs sue on behalf of themselves and all homeowners who were subjected to attempted foreclosure actions, completed foreclosure actions and subsequent eviction actions by the Servicer Defendants, the Trustee Defendants, FNMA, and/or FHLMC whereby the foreclosure actions on the mortgage loans of Plaintiffs and others, was in violation of Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602 and §3-603 as those Notes (joined to said mortgage loans), given by Plaintiffs and others, were not in default, due to the Servicer Defendants, FHLMC, or FNMA taking over the obligations of the Plaintiffs and others (pursuant to those Notes) and paying those obligations to the true holders of those Notes.

410.     Plaintiffs and others were harmed by the Servicer, Trustee, FNMA, and FHLMC Defendants' violation of Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106,

Art. 3, §3-602  and §3-603 in that they were foreclosed upon illegally, suffered the wrongful loss of property, suffered eviction from their homes, their credit ratings were damaged, incurred legal expenses related to bankruptcy, foreclosure and eviction defense, incurred moving and storage expenses, and were the subject of extreme emotional and mental distress.

411.     Plaintiffs and others have standing to make their claims for violation of Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in that they are parties to contracts, through those Notes, given in exchange for their mortgage loans, to their lender which were subsequently purchased and held by the various Trusts as noted herein.

412.     The Servicer, Trustee, FNMA, and FHLMC Defendants violated Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in that they knowingly took the actions described herein, acting on behalf of those Trusts.

413.     The Servicer, Trustee, FNMA, and FHLMC Defendants were negligent in their duty of care in their actions as stated herein.

414.     The Servicer Defendants, Trustee Defendants, FHLMC, or FNMA owed Plaintiffs and others reasonable duties of care as the servicers of their mortgage loans, and as Trustees of the Trusts that owned Plaintiffs and others Notes, to not illegally attempt to foreclose, or complete foreclosure on their mortgage loans and subsequently evict them from their rightful property.

415.     Plaintiffs and others relied on the Servicer, Trustee, FNMA, and FHLMC Defendants' reasonable duties of care owed to them to not be subjected to illegal foreclosure actions, and such reliance was reasonable. Plaintiffs and others were instead knowingly exposed to substantial risk of loss, by being illegally threatened with foreclosure, foreclosed upon, and evicted from their rightful property. As such, said Defendants breached those reasonable duties of care owed to Plaintiffs and others.

416.     There exists a close relationship of proximity between Plaintiffs and the Servicer
Defendants as the Servicer Defendants service the mortgage loan accounts of the Plaintiffs
and others.

417.     There exists a close relationship of proximity between the Trustee, FNMA, and
FHLMC Defendants, as they act in their capacity as Trustees of the Trusts, which own the
Notes and mortgage loans of Plaintiffs and others. Those Trusts are special purpose vehicles,
or "Shells", created for the sole purpose of owning those Notes and mortgage loans and as
such, the Trustee Defendants, FNMA, and FHLMC are responsible for all actions taken on
behalf of said Trusts.

418.     The Servicer Defendants, Trustee Defendants, FHLMC, or FNMA knowingly,
illegally foreclosed the mortgage loans of Plaintiffs and others and it was reasonably
foreseeable that those actions would be the direct cause of the harm suffered by Plaintiffs and
others.

419.     The Servicer Defendants, FHLMC, or FNMA knew they had, taken over Plaintiffs
and others monthly mortgage obligations, pursuant to their Notes, and made payments to the
Trusts that owned Plaintiffs and others Mortgages.

420.     The Trustee Defendants knew that the Servicer Defendants, FHLMC, or FNMA had
taken over Plaintiffs and others monthly mortgage obligations, pursuant to their Notes, and
made payments to the Trusts that owned Plaintiffs and others mortgage loans.

421.     The Trustee Defendants ignored their reasonable duties of care owed to Plaintiffs
and others as Trustees of the Trusts that owned Plaintiffs and others Notes and mortgage
loans, to stop, prevent or otherwise ensure that illegal foreclosure and eviction actions were
not taken against them.

422.     The Servicer Defendants, Trustee Defendants, FHLMC, or FNMA attempted
foreclosure, foreclosed on Plaintiffs and others mortgage loans, and subsequently evicted
them from their rightful property, knowing their Notes were not in default, exposing them to
significant risk of loss.

423.     Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving, storage and relocation expenses.

424.     Plaintiffs and others have suffered general damages such as loss of property interest, negative impact to credit ratings, extreme mental and emotional distress as the result of being threatened with foreclosure, and eventual loss of their homes.

425.     The Servicer Defendants negligence caused Plaintiffs and others harm which was reasonably foreseeable.

426.     Plaintiffs seek punitive damages on behalf of themselves and others so similarly situated.

427.     Plaintiffs claim on behalf of themselves and others so similarly situated that the Servicer Defendants, Trustee Defendants, FNMA, and FHLMS's actions, as stated herein above, were the direct cause of the reasonably foreseeable harm they suffered.

428.     Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, the Defendants' current employees and current or former officers, directors, agents, representatives, their family members, the members of this Court and its staff.

429.     Plaintiffs do not know the exact size or identities of members of the Class, since such information is in the exclusive control of Defendants.  Plaintiffs believe that the Class encompasses tens or hundreds of thousands of individuals whose identities can be readily ascertained from Defendants' books and records.  Therefore, the Class is so numerous that joinder of all members is impracticable.

430.     All members of the Class have been subject to and affected by the same conduct. The claims are based on standard form contracts.

431.     There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the class.  These questions include, but are not limited to the following:

    a.    the nature and scope of the Servicer Defendants', FNMA, and FHLMC's delinquency advance payments, made to Trusts, when taking over the obligations, pursuant to the Notes of Plaintiffs and others;

    b.     the nature, scope, and knowledge of the Trustee Defendants', FNMA, and FHLMC's receipt of delinquency advance payments made to Trusts by the Servicer Defendants when taking over the obligations, pursuant to the Notes of Plaintiffs and others;

    c.    whether the Servicer, Trustee, FNMA, and/or FHLMC Defendants' conduct in the circumstances described herein and in the underlying complaints amounts to violation of Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603;

    d.    whether the Servicer, Trustee, FNMA, and/or FHLMC Defendants' conduct in the circumstances described herein and in the underlying complaints was negligent;

    e.    whether the Court can order damages and enter injunctive relief.

432.     The claims of the Named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the class in that the Named Plaintiffs and the other members of the class were subject to the same conduct.

433.     The named Plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the class claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

434.    A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

435.    This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

436.    The Servicer, Trustee, FNMA, and/or FHLMC Defendants' acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

 **D.  CAUSES OF ACTION**

**COUNT IV**
**As to the Servicer, Trustee, FHLMC, and FNMA Defendants**
**Violation of Massachusetts Uniform Commercial Code,**
**G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603**

437.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

438.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

439.    As the entities responsible for exercising the statutory power of sale, the Servicer, Trustee, FNMA and FHLMC Defendants owed Plaintiffs and others a duty of good faith and fair dealing in their conduct leading up to the foreclosure proceedings and sale, in ensuring that their actions were in fact legal.

440.    The Servicer, Trustee, FNMA and FHLMC Defendants knew that Servicer, FNMA or FHLMC Defendants had taken over the obligations of Plaintiffs and others Notes, pursuant to Section 8 of those Notes, and paid the monthly mortgage loan obligations of Plaintiffs and others to the true holder in due course of their Notes, and as such Plaintiffs' and others monthly obligations under those Notes were paid.

441.    By conducting foreclosure proceedings when Plaintiffs' and others monthly obligations were paid the Servicer, Trustee, FNMA and FHLMC Defendants violated Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603.

442.    Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving and relocation expenses.

443.    Plaintiffs and others have suffered general damages such as loss of property interest, negative impact to credit ratings, loss of their homes, and extreme emotional distress.

444.    Plaintiffs are entitled to punitive damages on behalf of themselves and others so similarly situated.

445.    The Plaintiffs and others are entitled to a declaratory judgment determining that the foreclosure proceedings and/or sales of their property are void.

446.    Plaintiffs and others are entitled to an injunction requiring that Defendants' take all necessary steps to restore legal title to their property as if no foreclosure sale had ever occurred.

447.    Plaintiffs and others are entitled to an injunction requiring that the Defendants be prevented from foreclosure action against Plaintiffs and others so similarly situated, or any eviction action until such time as proper notice is made pursuant to statute.

448.    The Plaintiffs and others so similarly situated are entitled to cancellation of costs and fees assessed to their accounts for wrongful foreclosure, together with additional damages.

449.    Defendants conduct was likely to induce reliance and to create confusion and misunderstanding.

450.    Defendants conduct as set forth herein is not required, permitted or authorized by any state or federal law.

451.    Defendants conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

452.     Plaintiffs and others are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

**COUNT V**
**As to the Servicer, Trustee, FHLMC, and FNMA Defendants**
**Negligence**

453.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

454.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

455.     As the entities responsible for exercising the statutory power of sale, the Servicer, Trustee, FNMA and FHLMC Defendants owed Plaintiffs and others reasonable duties of care in their conduct leading up to the foreclosure proceedings and sale to ensure that the actions taken were in fact legal and would not knowingly expose Plaintiffs and others to substantial risk of loss.

456.     The Servicer, Trustee, FNMA and FHLMC Defendants knew that Servicer, FNMA or FHLMC Defendants had taken over the obligations of Plaintiffs and others Notes, pursuant to Section 8 of those Notes, and paid the monthly mortgage loan obligations of Plaintiffs and others to the true holder in due course of their Notes, and as such Plaintiffs' and others monthly obligations under those Notes were paid.

457.     The Servicer Defendants, Trustee Defendants, FHLMC, or FNMA owed Plaintiffs and others reasonable duties of care as the servicers of their mortgage loans, and as Trustees of the Trusts that owned Plaintiffs and others Notes, to not illegally attempt to foreclose, or complete foreclosure on their mortgage loans and subsequently evict them from their rightful property.

458.     Plaintiffs and others relied on the Servicer, Trustee, FNMA, and FHLMC Defendants' duties of care owed to them and such reliance was reasonable. Plaintiffs and others were instead knowingly exposed to substantial risk of loss, by being negligently and

85

illegally threatened with foreclosure, foreclosed upon, evicted from their rightful property. By doing so, the Servicer, Trustee, FNMA and FHLMC Defendants their duties of reasonable care owed to Plaintiffs and others.

459.     The Servicer Defendants, Trustee Defendants, FHLMC, or FNMA knowingly negligently, recklessly, and illegally foreclosed the mortgage loans of Plaintiffs and others and it was reasonably foreseeable that those actions would be the direct cause of the harm suffered by Plaintiffs and others.

460.     The Servicer Defendants, Trustee Defendants, FHLMC, or FNMA knew they had, taken over Plaintiffs and others monthly mortgage obligations, pursuant to their Notes, and made delinquency advance payments to the Trusts that owned Plaintiffs and others Mortgages.

461.     The Servicer Defendants, Trustee Defendants, FHLMC, or FNMA then foreclosed on Plaintiffs and others , knowing their Notes were not in default, exposing them to significant risk of loss

462.     Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving and relocation expenses.

463.     Plaintiffs and others have suffered general damages such as loss of property interest, negative impact to credit ratings, loss of their homes, and extreme emotional distress.

464.     Plaintiffs are entitled to punitive damages on behalf of themselves and others so similarly situated. Defendants conduct as set forth herein is not required, permitted or authorized by any state or federal law.

465.     Defendants conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

466.     Plaintiffs and others are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.        WHEREFORE, the Plaintiffs respectfully request the following relief:

a.        Certify this case as a class action and appoint the named Plaintiffs to be class representatives and their counsel to be class counsel;

b.        Enter a judgment declaring the acts and practices of Defendants complained of herein do constitute a fraud, negligence, and violations of state uniform commercial code, together with an award of monetary damages and other available relief on those claims;

c.        Grant a permanent or final injunction enjoining Defendants agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

d.        Order specific performance of Defendants obligations together with other relief required by law;

f.        Award actual, exemplary and/or statutory minimum damages;

g.        Award restitution and prejudgment interest;

h.        Award punitive damages;

i.        Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

j.        Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

Dated:  August 9, 2012

Respectfully Submitted,

_____/s/ Todd S. Dion_____ _____
Todd S. Dion, Esq. (BBO #659109)
1319 Cranston Street
Cranston, RI 02920
Telephone: 401-942-9924
Facsimile:  401-942-9925
toddsdion@msn.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2012, a copy of the foregoing document, filed through the CM/ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on the parties listed on the NEF as not receiving electronic notice.

_____/s/ Todd S. Dion___ _____
Todd S. Dion, Esq.